**In the Matter of Petitions for NATURALIZATION OF 68 FILIPINO WAR VETERANS Pursuant to Sections 701–702, Nationality Act of 1940.**

No. 186373.

United States District Court,
N. D. California.

Nov. 10, 1975.

Addendum Dec. 1, 1975.

932

Phelan, Simmons & Ungar, by Donald L. Ungar, Fallon, Hargreaves, Bixby & McVey, by Gerald L. McVey, Alan M. Kaufman, Joseph S. Hertogs, San Francisco, Cal., for various petitioners.

Byron B. Park, San Francisco, Cal., for Alejandro Acain Quijano.

Philip Leadbetter, Brian H. Simpson, San Francisco, Cal., for the Immigration and Naturalization Service.

Alexander Esclamado, Publisher, Philippine News, San Francisco, Cal., amicus curiae for petitioners.

## MEMORANDUM OF OPINION

RENFREW, District Judge.

Petitioners are 68 Filipinos whose petitions for naturalization pursuant to Sections 701–705 of the Nationality Act of 1940, ch. 199, 56 Stat. 182 *et seq.,* as amended, 8 U.S.C. §§ 1001–1005 (1940 ed. Supp. V), were denied by the Immigration and Naturalization Service (INS). Petitioners, who have lived in the United States for varying lengths of time, chiefly as "visitors," claim to have served honorably in the United States armed forces during the Second World War via service in the Commonwealth Army of the Philippines or the Philippine Scouts. They maintain that their petitions for naturalization should have been granted by the INS despite expiration of the law on which their eligibility is founded and now ask the Court to grant their petitions. The Court's jurisdiction is based on 8 U.S.C. § 1421(a).

This matter has a complex historical background, but the basic facts are generally undisputed.[1] On March 27, 1942, Sections 701–705 were added to the Nationality Act of 1940 by the Second War Powers Act of 1942, ch. 199, 56 Stat. 176 *et seq.,* as amended. Section 701 exempted alien servicemen who served outside the continental limits of the United States from certain of the usual requirements for naturalization, including those of a period of residence in the United States and literacy in English. As amended by subsequent acts of Congress, it was ultimately specified that all petitions filed under Section 701 had to be filed no later than December 31, 1946. Section 702 provided for the naturalization overseas of persons eligible for naturalization under Section 701 who, while serving honorably in the military or naval forces of the United States, were not within the jurisdiction of any court authorized to naturalize aliens. Section 705 directed the Commissioner of Immigration and Naturalization, with the approval of the Attorney General, to make such rules and regulations as were necessary to carry into effect the provisions of the Act.[2]

---

1. There is, of course, considerable dispute as to the factual basis for many of the petitioners' individual claims.

2. Section 701 provided in pertinent part: "[A]ny person not a citizen, regardless of age, who has served or hereafter serves honorably in the military or naval forces of the United States during the present war and [w]ho shall have been at the time of his enlistment or induction a resident thereof and who (a) was lawfully admitted into the United States, including its Territories and possessions, or (b) having entered the United States, including its

Pursuant to the Act, officers of the INS were sent to overseas military posts to effect the naturalization of eligible members of the United States armed forces. Between 1943 and 1946, these officers traveled from post to post through England, Iceland, North Africa, and the islands of the Pacific, naturalizing thousands of foreign nationals. In the Philippines, of course, naturalization of alien servicemen was impossible during the Japanese occupation. However, with the liberation of the Philippines, implementation of the Act commenced, following resolution of two preliminary problems of statutory interpretation concerning the eligibility of Filipino servicemen under Sections 701–702.[3] In early August of 1945 the INS designated Mr. George H. Ennis, Vice Consul of the United States at Manila, to naturalize aliens pursuant to Section 702.

Pursuant to Section 10(a) of the Philippine Independence Act of 1934, ch. 84, 48 Stat. 463, the Philippines were to become a fully independent, self-governing country on July 4, 1946. Apparently fearful that large numbers of Filipinos would be naturalized and emigrate to the United States on the eve of independence, an unidentified official of the Philippine Government conveyed to the United States Department of State the Philippine Government's concern that Filipinos who had always been domiciled in the Philippines were being naturalized by Vice Consul Ennis.[4] Based on this

Territories and possessions, prior to September 1, 1943, being unable to establish lawful admission into the United States serves honorably in such forces beyond the continental limits of the United States or has so served may be naturalized upon compliance with all the requirements of the naturalization laws except that (1) no declaration of intention, no certificate of arrival for those described in group (b) hereof, and no period of residence within the United States or any State shall be required; (2) the petition for naturalization may be filed in any court having naturalization jurisdiction regardless of the residence of the petitioner; (3) the petitioner shall not be required to speak the English language, sign his petition in his own handwriting, or meet any educational test; * * * *Provided, however,* That * * (3) the petition shall be filed not later than December 31, 1946 * * *."

Section 702 provided in pertinent part: "During the present war, any person entitled to naturalization under section 701 of this Act, who while serving honorably in the military * * * forces of the United States is not within the jurisdiction of any court authorized to naturalize aliens, may be naturalized in accordance with all the applicable provisions of section 701 without appearing before a naturalization court. The petition for naturalization of any petitioner under this section shall be made and sworn to before and filed with, a representative of the Immigration and Naturalization Service designated by the Commissioner or a Deputy Commissioner, which designated representative is hereby authorized to receive such petition in behalf of the Service, to conduct hearings thereon, to take testimony concerning any matter touching or in any way affecting the admissibility of any such petitioner for naturalization, to call witnesses, to administer oaths, including the oath of the peti-

tioner and his witnesses to the petition for naturalization and the oath of renunciation and allegiance prescribed by section 335 of this Act, and to grant naturalization, and to issue certificates of citizenship * * *."

Section 705 provided in pertinent part: "The Commissioner, with the approval of the Attorney General, shall prescribe and furnish such forms, and shall make such rules and regulations, as may be necessary to carry into effect the provisions of this Act."

The Nationality Act of 1940, of which these sections were a part, was repealed by Section 403(a)(42) of the Immigration and Nationality Act of 1952 (66 Stat. 280). The Government argues, and the Supreme Court apparently agreed in *INS v. Hibi*, 414 U.S. 5, 7, 94 S.Ct. 19, 20, 38 L.Ed.2d 7 (1973), that this Act only "authorized" representatives of the INS to naturalize certain aliens. However, Section 705 clearly directed the Commissioner "to carry into effect the provisions of this Act." While the Commissioner had discretion over how and when to deploy his representatives, there can be no doubt that Congress intended and expected the Commissioner to use his best efforts to allow aliens serving in the American armed forces to be naturalized.

3. In 1945 the INS and the Attorney General concluded that members of the Army of the Commonwealth of the Philippines qualified under the Act, and that prior residence in the Philippines satisfied the residency requirements of Sections 701 and 702 even for one who had never resided in the United States. Memorandum from Ugo Carusi, Commissioner, INS, to Tom C. Clark, Attorney General, September 13, 1945.

4. The concern of the Philippine Government was not made a fact of record. Indeed, neither the President of the Philippine Common-

concern, on September 13, 1945, the Commissioner of the INS wrote to the Attorney General requesting that the authority previously granted to Vice Consul Ennis to naturalize aliens be revoked, and that no new naturalization officer be named.[5] The Attorney General approved this request on September 26, 1945, and the authority of Vice Consul Ennis was immediately revoked. However, notice of that revocation did not reach Ennis until late October, 1945, for he continued to naturalize aliens until October 26, 1945. It was not until August, 1946, that another naturalization agent, Mr. P. J. Phillips, was appointed for the Philippines. Approximately 4000 Filipinos were naturalized by Mr. Phillips under Section 702 between August and December 31, 1946, when the Act expired. Thus, contrary to the express intentions of Congress, Filipinos eligible for naturalization under Section 702 were denied the opportunity to take advantage of the Act for a period of approximately nine months.[6]

Petitioners urge that the foregoing events establish a violation of their right to due process of law and therefore the Court should now grant their petitions for naturalization. All parties are aware of the recent Supreme Court decision, *INS v. Hibi,* 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973), where the Court, in denying the petition for naturalization of a Filipino who had served in the Philippine Scouts, refused to estop the Government from relying on the December 31, 1946, expiration date of Sections 701–705. In the instant case petitioners seek to distinguish *Hibi* as a narrow holding, whereas the Government contends that *Hibi* is controlling and mandates denial of these petitions.

Originally the Court divided petitioners into four categories based on factual differences in their cases. Subsequently, Category II cases, in which there were claims of new evidence of affirmative misconduct on the part of the INS, see *INS v. Hibi, supra,* 414 U.S. at 8–9, 94 S.Ct. 19, were reassigned to the other categories, and Category II was eliminated. The three remaining categories, and the issues they present, are as follows: [7]

*Category I.* Eight petitioners argue that they did all they could in 1945 and 1946 to become naturalized under Section 702 and that they should be considered to have "constructively filed" petitions for naturalization pursuant to the

---

wealth nor his Government expressed any official opinion on the subject. Memorandum from Paul McNutt, United States High Commissioner to the Philippine Islands, to Edward J. Shaughnessy, Special Assistant to the Commissioner of the INS, November 6, 1945.

**5.** The Commissioner's letter read in pertinent part:

"The Philippine Government again has expressed to the Department of State its concern because Filipino members of the armed forces of the United States are being naturalized even though they have always been domiciled in the Philippine Islands. Since the Islands are not embraced within the domain of any naturalization court, naturalization therein may be awarded only by an administrative official designated by me under the authorization of Section 702 of the Nationality Act, 8 U.S.C. § 1002. Mr. George H. Ennis, Vice Consul of the United States at Manila, has been designated to grant naturalizations under Section 702, but I do not believe he has as yet exercised his authority.

"In view of the concern expressed by the Philippine Government, it is my belief that

that situation might best be handled by revoking the authority previously granted to Mr. Ennis and by omitting to designate any representative authorized to confer citizenship in the Philippine Islands. This course would eliminate a source of possible embarrassment in our dealings with the Philippine people, who probably will be awarded independence in the near future."

**6.** There is no doubt that this situation was foreseen and intended by the INS. As stated in a contemporaneous internal INS memorandum, the revocation of Vice Consul Ennis' naturalization authority left "the rather anomalous situation that while we recognize in law the legal right of these persons to the benefits under the Act we have, from an administrative standpoint, made it impossible for such persons to acquire these benefits." Memorandum from Edward J. Shaughnessy, Special Assistant to the Commissioner of the INS, to Ugo Carusi, Commissioner, INS, October 19, 1945.

**7.** The categories have been reordered and renumbered for convenience of discussion.

statutory requirements. They further argue that the action of the INS in their cases constitutes affirmative misconduct which estops the Government from relying on the expiration date of Sections 701–705.

*Category II.* Fifty-three petitioners did not take any timely steps to be naturalized before December 31, 1946, while in the American armed forces. However, these petitioners contend that they were denied due process of law by the failure of the INS to make naturalization under Section 702 available to them when it was available to other servicemen similarly situated around the world.

*Category III.* Seven petitioners are in the same position as those in Category II, except that they have not shown that they have served in the United States armed forces as required by Section 701. These petitioners argue that proof of service requirements should be liberally construed to allow alternatives to the statutory requirements.

## CATEGORY I

The petitioner for naturalization in *INS v. Hibi, supra,* 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7, served in the Philippine Scouts during World War II and was discharged in December, 1945. At no time during his service in the United States armed forces did Hibi attempt to avail himself of the opportunity to become naturalized under the expedited procedures of Section 702. He entered the United States for the first and only time on April 25, 1964, on a visitor-for-business visa and subsequently filed a petition for naturalization based on Section 702. Hibi argued that the Government was estopped from relying on the statutory time limit because it failed to advise him, during the time he was eligible of his right to naturalization and failed to provide a naturalization representative in the Philippines during all the time he was eligible for naturalization.

The Supreme Court held that, although *Montana v. Kennedy,* 366 U.S. 308, 314–315, 81 S.Ct. 1336, 6 L.Ed.2d 313 (1961), had left open the question whether "affirmative misconduct" (rather than mere neglect) on the part of the Government might estop it from denying citizenship, the Government conduct complained of in *Hibi* did not rise to the level of affirmative misconduct. 414 U.S. at 8–9, 94 S.Ct. 19. It is clear then that, as the Court of Appeals for the Ninth Circuit concluded in construing *Hibi,* since no such conduct was involved in that case, "[t]he Court did not preclude invoking estoppel against the government." *United States v. Wharton,* 514 F.2d 406, 410 (9 Cir. 1975).[8]

Other courts have provided this Court with little guidance in deciding what constitutes "affirmative misconduct" on the part of the Government sufficient to give rise to estoppel. In *Montana v. Kennedy, supra,* 366 U.S. at 314–315, 81 S.Ct. 1336, the Supreme Court suggested, without deciding, that estoppel might lie against the Government under the circumstances presented in *Lee You Fee v. Dulles,* 236 F.2d 885 (7 Cir. 1956), *rev'd* 355 U.S. 61, 78 S.Ct. 138, 2 L.Ed.2d 106 (1957) (tardiness or unnecessary delay by Government officials in enabling alien to comply with condition of citizenship; dicta), and *Podea v. Acheson,* 179 F.2d 306 (2 Cir. 1950) (erroneous advice by State Department). More recently, the Court of Appeals for this Circuit distinguished *Hibi* on the grounds that that case concerned governmental "nonfeasance" as opposed to governmental "misfeasance":

> " 'Nonfeasance' and 'misfeasance' are indeed slippery terms. The potentially elusive nature of their meanings does not obscure, however, the very real distinction between Government acts

---

8. The Court of Appeals' views in *Wharton* are consistent with earlier pre-*Hibi* opinions of that Court wherein the United States was estopped. *United States v. Lazy FC Ranch,* 481 F.2d 985, 990 (9 Cir. 1973); *Brandt v. Hickel,* 427 F.2d 53 (9 Cir. 1970); *United States v. Georgia-Pacific Company,* 421 F.2d 92, 103 (9 Cir. 1970); *Schuster v. C. I. R.,* 312 F.2d 311, 318 (9 Cir. 1962).

which cause a person to neglect an opportunity and those which mislead him into changing his position in a manner which, absent application of estoppel, would prove ultimately detrimental." *Santiago v. INS*, Civil No. 73–2497, 73–2498, 73–2499 and 73–2462 (9 Cir. March 4, 1975). Slip Opinion at 5, n. 4.

This Court is, of course, bound by the *Hibi* decision and welcomes that decision as an indication of how the Supreme Court viewed the question of estoppel of the Government in the particular factual context of that case. However, as the Court stated at the hearing held on the petitions in the instant case, the *Hibi* decision—a summary reversal from which three Justices dissented strongly, rendered without the benefit of oral argument—covers the facts of that case. The Court feels that *Hibi*, as construed by the Court of Appeals for this Circuit in *Santiago v. INS, supra,* cannot be read broadly as dispositive of those cases whose facts establish governmental misfeasance and are thus distinguishable. Therefore, it is incumbent upon the Court to determine whether any one of the petitioners in Category I has shown that the acts of the Government were acts of misfeasance, actively "mislead[ing] him into changing his position in a manner which, absent application of estoppel, would ultimately prove detrimental." *Santiago v. INS, supra,* at 5 n. 4.

It is undisputed that two of the petitioners [9] actually filed application forms for naturalization while serving in the American armed forces. It is also undisputed that a third petitioner [10] wrote to the Attorney General six months prior to his discharge from the service inquiring how he could become naturalized. Each of these petitioners subsequently received a letter from the INS returning the application for naturalization, in the first two cases, and stating that no action could be taken upon an application for naturalization filed by a person stationed in the Philippines and that "[n]o purpose would be served, therefore, by the submission of such an application to this office." Four other petitioners [11] testified under oath before a Designated Examiner of the INS that they filed the appropriate form for naturalization under Section 702 while they were still in the service but that no action was taken on their applications.

 In the opinion of the Court, these petitioners, unlike Hibi, have presented evidence of affirmative misconduct on the part of the Government. While

"the failure to fully publicize the rights which Congress accorded under the Act of 1940, or the failure to have stationed in the Philippine Islands during all of the time those rights were available an authorized naturalization representative", *Hibi v. INS, supra,* 414 U.S. at 8–9, 94 S.Ct. at 22,

may constitute merely nonfeasance, refusing to accept an eligible individual's application for naturalization and explicitly informing him that no purpose would be served by submitting an application, or failing totally to act upon a pending application, is the kind of conduct likely to "mislead him into changing his position in a manner which, absent application of estoppel, would prove ultimately detrimental." [12]

---

9. Lorenzo Fortuno, Petition No. 191181, and Antonio Tirona, Petition No. 194282.

10. Eriberto Fontanilla, Petition No. 194228.

11. Felix Layug, Petition No. 206793; Godofreda Magalued, Petition No. 205595; Canuto Mangila, Petition No. 191543; and Alfredo Nerpiol, Petition No. 194905.

12. The Court is not unmindful of the fact that, except in the cases of Fortuno, Tirona and Fontanilla, the only evidence that naturalization applications were filed is the petitioners'

own testimony, with the further exception that in petitioner Magalued's case a witness testified that he saw Magalued fill out and submit the necessary form. The Court has carefully reviewed the testimony of these petitioners and finds it persuasive. Each petitioner testified under oath, with full opportunity for cross-examination by the Government's attorney. Furthermore, a reading of the transcripts of the hearings conducted by the INS Examiner has convinced the Court that in each case the petitioner presented a clear, plausible and

Therefore, the Court holds that these seven petitioners have proven that the action of the Government constituted acts of misfeasance. Because of its affirmative misconduct, the Government is estopped from relying upon the expiration date of Sections 701–705 as grounds for denial of their petitions for naturalization.[13]

As an alternative ground for according them the relief they seek, the petitioners in Category I contend that they should be deemed to have "constructively filed" everything necessary for naturalization pursuant to Section 702. They argue that because of the Government's refusal to act on their applications, there was nothing further they could do to avail themselves of their rights under Section 702 and rely on In re Vacontios' Petition, 155 F.Supp. 427, 433 (S.D.N.Y.1957), wherein the court held:

> "When one takes all necessary affirmative steps to comply with the literal requirements of a statute and is prevented from complying fully by the failure of an administrative agency to take the steps necessary to permit his compliance he will not be barred from asserting his rights under that statute."

Although the Court has held that these petitioners are entitled to prevail on the ground of estoppel, the Court feels it advisable to consider their claim of constructive filing both because the Supreme Court has never explicitly held that the Government can be estopped for affirmative misconduct and because that Court has not as yet had occasion to consider the distinction drawn by the Court of Appeals for this Circuit between governmental nonfeasance and misfeasance, as enunciated in Santiago v. INS, supra.

With the exception of Vacontios, petitioners have not brought to the attention of the Court, nor has the Court's own research disclosed, any case decided on the basis of constructive filing of a naturalization petition. Indeed, the Government argues that "constructive filing" is but another name for estoppel and that no case, Vacontios included, has purported to rely on any such doctrine. Petitioners, on the other hand, contend that the doctrines are distinct. They argue that they complied with Section 702 by attempting to file their petitions, not that the Government should be estopped from saying they did not comply with the statute.[14]

consistent account of the events surrounding his application for naturalization. The Court is aware of the difficulty the Government faces in attempting to rebut testimony of the kind presented here; however, based on the Court's independent examination of the record and the totality of the circumstances set forth therein, the Court believes that the petitioners have testified honestly and accurately concerning their naturalization petitions.

The Court notes further that it has carefully considered, and rejected, the Government's argument that petitioner Fortuno should be barred from asserting a claim for naturalization under Section 702, because on two occasions he failed to take advantage of an opportunity to be naturalized under different statutory provisions. The Court fails to see why one should be denied the benefits of one statutory provision to which one is otherwise entitled merely because one did not exploit the opportunity to secure the same benefits under other statutes whose requirements one also fulfilled.

13. One other petitioner was also included in Category I, Flaviano Diala, Petition No.

195052. The Court has reviewed the testimony of this petitioner before the INS Examiner and finds that by his own admission, he took no action to become naturalized prior to 1947. Consequently, the only conduct of the Government this petitioner can complain of is the failure of the Government to inform him of his right to naturalization under Section 702. It is clear from Hibi that such conduct is not affirmative misconduct. Therefore, this petitioner has been reassigned to Category II.

14. At the hearing petitioners went one step further and argued that they had actually, not constructively, filed their naturalization petitions because of the unique administrative procedures purportedly used to process Section 702 petitions. The procedures adopted by the INS contemplated a two-step application/petition process for naturalization pursuant to Section 702: The petitioner would file Form N–403, an application to file a formal petition for naturalization, which would be retained by the military until the naturalization proceedings; thereafter, following a preliminary examination by the designated representative of the INS, a formal petition would be prepared on

■ The Court is inclined to agree with petitioners. As stated by the *Vacontios* court, "It is important to note that the filing of Form N–400 [Form N–403 here] was the only affirmative step a prospective petitioner could take under the Service regulations." 155 F.Supp. at 430. Unlike Hibi, who made no effort to file a petition for naturalization while still in the army, these petitioners filed the appropriate form for commencing naturalization proceedings. Even if Form N–403 is not deemed to be the formal petition for naturalization, which the Court need not decide (see footnote 14, *supra*), its timely submission, given the administrative context surrounding naturalization under Section 702, is, in the Court's opinion, the constructive equivalent of filing a petition for naturalization. Therefore, the Court holds that the seven petitioners remaining in Category I constructively filed their petitions for naturalization and thus complied with the statutory deadline for filing.

## CATEGORY II

Petitioners in this category maintain that the Government deprived them of their Fifth Amendment right to due process of law by its failure to have stationed in the Philippines an INS representative authorized to naturalize servicemen pursuant to Section 702 during all of the time the rights conferred by that statutory provision were available. The Government argues that (1) the protection of the Due Process Clause did not extend to these petitioners following passage of the Philippine Independence Act on March 24, 1934; (2) even if these petitioners were protected by the Constitution during the period 1934 to 1946, their claim is barred by the decision of the Supreme Court in *Hibi, supra,* 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7; (3) the questions petitioners raise are not justiciable; and (4) in any event, petitioners have not been deprived of due process of law. The Court will consider each of these arguments in turn.

*Petitioners Were Protected by the Due Process Clause of the Fifth Amendment after March 24, 1934*

■ It is clear that at least from the time the Philippines were ceded to the United States until passage in 1934 of the Philippine Independence Act, ch. 84, 48 Stat. 456, residents of the Philippines enjoyed the protection of certain fundamental rights of the United States Constitution. To be sure, not every right guaranteed by the Constitution automatically adheres to residents of territory belonging to, but not part of, the United States;[15] however, it is beyond

Form N–411. INS Nationality Manual, §§ 953.83 to 953.86, Dec. 1, 1944. There is some question, however, whether these procedures were strictly followed, or whether the pressures generated by the large number of applications induced the INS to expedite the petition process and accept Form N–403 as the formal petition for naturalization. Although the evidence adduced before the Designated Examiner of the INS supports the latter position, the Court feels it is unnecessary to decide whether these petitioners *actually* filed for naturalization, and confines its discussion to the question of constructive filing.

15. As early as 1901, the Supreme Court stated in one of the *Insular Cases,*

"We suggest, without intending to decide, that there may be a distinction between certain natural rights, enforced in the Constitution by prohibitions against interference with them, and what may be termed artificial or remedial rights, which are peculiar to our own system of jurisprudence. Of the former class are the rights to one's own religious opinion and to a public expression of them, or, as sometimes said, to worship God according to the dictates of one's own conscience; the right to personal liberty and individual property; to freedom of speech and of the press; to free access to courts of justice, to due process of law and to an equal protection of the laws; to immunities from unreasonable searches and seizures, as well as cruel and unusual punishments; and to such other immunities as are indispensable to a free government. Of the latter class are the rights to citizenship, to suffrage [citation omitted], and to the particular methods of procedure pointed out in the Constitution, which are peculiar to Anglo-Saxon jurisprudence * * *.

"Whatever may be finally decided by the American people as to the *status* of these islands and their inhabitants—whether they shall be introduced into the sisterhood of states or be permitted to form independent

dispute that "[t]he guarantees of certain fundamental personal rights declared in the Constitution, as for instance that no person could be deprived of life, liberty or property without due process of law, had from the beginning full application in the Philippines and Porto Rico * *." *Balzac v. Porto Rico*, 258 U.S. 298, 312–313, 42 S.Ct. 343, 348, 66 L.Ed. 627 (1922).

The Government does not challenge the validity of these views; rather, it maintains that by the terms of the Philippine Independence Act the Islands were transformed into a foreign country into which the guarantees of the Constitution could not, and did not, penetrate. Specifically, the Government points to Section 8(a)(1) and (4) of the Act, wherein it was provided that for immigration purposes the Philippines would be considered a separate country and its residents would be deemed aliens, and to Section 8(a)(3), which provided that Foreign Service officers assigned to duty in the Philippines would be considered as stationed in a foreign country. It is the Government's position that as "aliens" resident in a "foreign country" these petitioners did not enjoy the benefits conferred by the United States Constitution.

▮ The Court disagrees. Even after passage of the Philippine Independence Act all citizens of the Philippines continued to owe allegiance to the United States. 48 Stat. 456, § 2(a)(1). The significance of "owing allegiance" to a state is best understood by reference to the immigration and nationality laws, specifically Sections 1101(a)(3), (22) and (31) of 8 U.S.C. Section 1101(a)(3) defines the term "alien" as "any person not a citizen or national of the United States." Section 1101(a)(22) defines "national of the United States" as "(A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States." Finally, the definition of "permanent" in Section 1101(a)(31) indicates that the status of the Philippines' citizens was not altered by the fact that their allegiance to the United States terminated on July 4, 1946.[16] Thus it is clear from these definitions that passage of the Philippine Independence Act did not impose alien status on all citizens of the Philippine Islands. Rather, Filipinos were nationals of the United States until July 4, 1946, the date of complete independence for the Philippines.[17]

Furthermore, the Act itself, when read in its entirety, does not establish that that Act immediately transformed the Philippines into a foreign country and its citizens into aliens. The sections of the Act relied upon by the Government show no more than that for certain purposes the Philippine Islands would be treated

governments—it does not follow that, in the meantime, awaiting that decision, the people are in the matter of personal rights unprotected by the provisions of the Constitution * *. Even if regarded as aliens, they are entitled under the principles of the Constitution to be protected in life, liberty and property." *Downes v. Bidwell*, 182 U.S. 244, 282–283, 21 S.Ct. 770, 785, 45 L.Ed. 1088 (1901). *See also Dorr v. United States*, 195 U.S. 138, 146–147, 24 S.Ct. 808, 49 L.Ed. 128 (1904).

**16.** Section 1101(a)(31) defines "permanent" as "a relationship of continuing or lasting nature, as distinguished from temporary, but a relationship may be permanent even though it is one that may be dissolved eventually at the instance either of the United States or of the individual, in accordance with law."

**17.** · The quoted definitions were enacted by the Act of June 27, 1952, which revised and reco- dified the immigration and nationality laws, 8 U.S.C. § 1101 *et seq.* The definitions in force during the time period relevant here are set forth in Section 101 of the (repealed) Nationality Act of 1940, ch. 876, 54 Stat. 1137. Although less comprehensive than the later set of definitions, the 1940 definitions do not differ in substance from those enacted in 1952. Section 101(a) defined the term "national" as "a person owing permanent allegiance to a state." Section 101(b) defined "national of the United States" as "(1) a citizen of the United States, or (2) a person who, though not a citizen of the United States, owes permanent allegiance to the United States. It does not include an alien." Thus, these earlier definitions as well support the Court's conclusion that Filipinos were nationals of the United States until July 4, 1946.

as a foreign country. The overwhelming thrust of the Act, however, is that until it achieved complete independence, the Philippines would remain subject to the control and sovereignty of the United States, although American sovereignty would be exercised selectively.[18] Although the Philippines enjoyed the status of an independent country in some respects, as was reflected in its relations with the international community,[19] it is oversimplification to conclude that after 1934 the Philippines enjoyed all attributes of a completely independent sovereign state. Such a conclusion not only ignores the clear import of the 1934 Act and the subsequent complex pattern of Philippine-United States relations, but flies in the face of settled judicial authority. Soon after passage of the Independence Act, for example, it was held that "[s]o far as the United States is concerned, the Philippine Islands are not yet foreign territory." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 319, 57 S.Ct. 764, 769, 81 L.Ed. 1122 (1937).

Thus, the clear weight of statutory and judicial authority establish that the Philippines were to be treated as a foreign country only for limited purposes. *See Hooven & Allison Co. v. Evatt, supra*, 324 U.S. at 677, 65 S.Ct. 870. Nowhere in the Act is it intimated that one of these purposes would be to deny residents of the Islands, American nationals, the fundamental guarantees of the Constitution. On the contrary, the Act evidences an unmistakable Congressional intent to preserve for Filipinos basic civil rights.[20]

■ Accordingly, the Court holds that petitioners are entitled to claim the protection of fundamental guarantees of the United States Constitution for events occurring prior to Philippine Independence on July 4, 1946.

### The Supreme Court Decision in Hibi Is Not Dispositive of Petitioners' Claim Here

The Government argues that in *Hibi* the Supreme Court already considered and rejected petitioners' contention that the Government's failure to have stationed in the Philippines an authorized naturalization representative during all of the time rights under Section 702 were available deprived them of their constitutional rights. Petitioners, however, while admitting that the facts of their cases correspond exactly to the factual situation in *Hibi*, maintain that *Hibi* was a narrow holding based solely upon estoppel and that at no time was the constitutional question raised or considered.

The Court is of the opinion that a careful reading of *Hibi* supports petitioners' position. While the Court cannot lightly disregard a Supreme Court decision dealing with the precise factual situation presented here, the Court notes again that *Hibi* was a summary reversal decided solely on the basis of a petition for certiorari without the benefit of full

---

**18.** By the terms of the Act the United States retained considerable control over both the internal and external affairs of the Philippines, including, *inter alia*, the right to conduct its foreign affairs, to approve certain laws passed by the Philippine Legislature, to review decisions of the Philippine courts, and to intervene directly in the government of the Islands. Sections 2(a)(10), 2(a)(11), 2(a)(13) and 2(a)(14).

**19.** Between 1935 and 1944 the Philippine Commonwealth participated as a signatory in the following: Agreement and Protocol Regarding Production and Marketing of Sugar of May 6, 1937; Universal Postal Convention of May 23, 1939; Declaration by United Nations of January 1, 1942 (the Philippines signed the Decla-

ration on June 14, 1942); Agreement for United Nations Relief and Rehabilitation Administration of November 9, 1943; United Nations Monetary and Financial Conference at Bretton Woods, New Hampshire, of July 1 to 22, 1944; The Protocol Prolonging the International Agreement Regarding the Regulation of Production and Marketing of Sugar of August 31, 1944; The International Civil Aviation Conference of November 1 to December 7, 1944. *Hooven & Allison Co. v. Evatt*, 324 U.S. 652, 676 n. 8, 65 S.Ct. 870, 89 L.Ed. 1252 (1945).

**20.** *Cf.* Section 2(a) (bill of rights to be contained in Philippine Constitution); Section 2(a)(3) (freedom of religion); Section 2(a)(14) (right of Presidential intervention for the protection of life, property and individual liberty).

briefs and oral argument. The Supreme Court itself has recognized that a summary disposition of a case wherein a constitutional issue was raised and presented to the Court in oral argument, but was not treated substantively in the Court's opinion, is "obviously * * * not of the same precedential value as would be an opinion of this Court treating the question on the merits." *Edelman v. Jordan,* 415 U.S. 651, 671, 94 S.Ct. 1347, 1359, 39 L.Ed.2d 662 (1974). *A fortiori,* when the constitutional question was never even raised before the Supreme Court, this Court feels markedly less constrained to forego consideration of a constitutional claim that another litigant could have, but did not, assert.[21] Therefore, the Court holds that petitioners are not barred by *Hibi* from raising their constitutional claim.

*This Case Presents a Justiciable Question*

The Government contends that the issues petitioners raise are not properly justiciable. It argues that the Attorney General's decision to revoke the naturalization authority of Vice Consul Ennis and to omit designating a naturalization representative for the Philippines was based on information received from the Department of State concerning Filipino-American relations and was clearly taken in furtherance of foreign policy objectives of the United States. Relying on such cases as *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 319–320, 57 S.Ct. 216, 81 L.Ed. 255 (1936), *United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 543, 70 S.Ct. 309, 94 L.Ed. 317 (1950), and *Harisiades v. Shaughnessy,* 342 U.S. 580, 589, 72 S.Ct. 512, 96 L.Ed. 586 (1952), the Government maintains that such a decision of the executive branch regarding the conduct of foreign affairs is a political act immune from judicial scrutiny.

Petitioners, on the other hand, argue that the Attorney General's actions were not motivated by foreign policy considerations and even if they were, they are properly reviewable by this Court since their effect was to frustrate completely a clearly expressed Congressional intent.[22]

21. That the constitutional claim raised here was neither presented to nor considered by the Supreme Court in *Hibi* is clear from the Government's petition for a writ of certiorari in that case and the language of the Court's opinion. The petition presented the sole question,

"Whether the principle of estoppel is applicable against the government so that a Philippine national whose right to American citizenship expired in 1946 is nonetheless now entitled to such citizenship because during the time in question the American authorities did not specifically advise him of his eligibility to apply for naturalization and withdrew from the Philippines the designated immigration representative to whom he could have applied for naturalization." Government's Petition for Certiorari at 2, *INS v. Hibi, supra,* 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7.

Consistent with the formulation of that question, the Government's argument was confined exclusively to the issue of estoppel. 414 U.S. at 9–18, 94 S.Ct. 19.

Furthermore, it is clear from the reasoning of the Supreme Court that the Court was concerned entirely with the estoppel issue. The Court's holding was worded as follows:

"We do not think that the failure to fully publicize the rights which Congress accorded under the Act of 1940, or the failure to have stationed in the Philippine Islands during all of the time those rights were available an authorized naturalization representative, can give rise to an estoppel against the Government.

"Respondent's effort to claim naturalization under a statute which by its terms had expired more than 20 years before he filed his lawsuit must therefore fail." 414 U.S. at 8–9, 94 S.Ct. at 22.

22. The brief submitted by *amicus curiae* on behalf of petitioners argues further that it is logically impossible to speak of Filipino-American relations prior to July 4, 1946, in terms of American *foreign* relations since the conduct of the Philippines' foreign affairs was subject to the direct control and supervision of the United States pursuant to Section 2(a)(10) of the Philippine Independence Act. Any so-called "Filipino-American international relations," *amicus* contends, meant nothing more than the United States dealing with itself.

*Amicus'* argument, though ingenious, overlooks the fact that just as the Philippine Independence Act did not transform the Islands into a completely foreign country so far as the availability to Filipinos of fundamental constitutional guarantees was concerned, neither did it relegate the Philippines to the status of a

A long line of decisions firmly establishes the principle that the conduct of the foreign relations of the United States is committed by the Constitution to the executive and legislative—the "political"—branches of our government, and that courts should decline considering the propriety of what was done in the exercise of that political power. *See, e. g., Oetjen v. Central Leather Co.,* 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918); *United States v. Curtiss-Wright Export Corp., supra,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255. The courts' refusal to decide such political questions is not based on any direct constitutional command, but on a sensitive appreciation of the relationship between the judiciary and the coordinate branches of the federal government. "The nonjusticiability of a political question is primarily a function of the separation of powers", *Baker v. Carr,* 369 U.S. 186, 210, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962), and "limits the exercise, not the existence, of federal judicial power", *Atlee v. Laird,* 347 F.Supp. 689, 701 (E.D.Pa.1972) (three-judge court), *aff'd summarily,* 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973).

However, not every question involving foreign affairs is nonjusticiable. "[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance. Our cases in this field seem invariably to show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture

mere appendage of the United States, lacking all competence to participate in the international arena as a sovereign state. Moreover, *amicus'* contention ignores the significant role the Philippines played in international affairs during the period 1934 to 1946. *See* n. 19, *supra.* It is but sophistry to argue that no expression of concern from the United States Department of State regarding Filipino-American relations, practically on the eve of complete Philippine independence, could present matters touching upon this country's foreign policy.

*Amicus* also asserts that even if the Philippine Islands were capable of conducting its own foreign affairs, the Government has introduced insufficient evidence to establish that the Philippine Government was concerned about the naturalization of Filipino members of the American armed forces. *Amicus* points out that there was no Act of the Philippine Congress, no Executive Order or Proclamation of the Philippine President, nor even a *note verbale* or other diplomatic communication from the Philippine Secretary of Foreign Affairs, expressing the official concern of the Philippine Government, and that the only proof the Government has offered is the "self-serving allegation" of the INS Commissioner in his letter of September 13, 1945, to the Attorney General, *supra,* n. 5.

*Amicus'* position on this matter highlights one of the very reasons the conduct of foreign affairs is generally deemed a nonjusticiable political act, namely, that the information on which decisions are based is frequently confidential or otherwise not of public record.

"In certain instances, it would surely be conceded, the information necessary to a rea-soned judgment should remain confidential. If, because of confidential information, not all the facts could be evaluated, any adjudication of a case whose decision might adversely affect this country's international posture would be imprudent." *Atlee v. Laird,* 347 F.Supp. 689, 702 (E.D.Pa.1972) (three-judge court), *aff'd summarily,* 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973).

In the instant case the record clearly establishes that "all the facts [were] not made facts of record." Memorandum from Edward J. Shaughnessy to Ugo Carusi, November 9, 1945. It would be intolerable for the Court to conclude that because the communication from the Philippine Government was not made publicly and officially, therefore the Government cannot assert that its actions were undertaken in furtherance of American foreign policy objectives.

The Court does not mean to imply, however, that a bald assertion from the Government that an executive decision was made pursuant to the conduct of this country's foreign affairs suffices to render that decision a political act. However, when, as here, there is contemporaneous evidence that such indeed was the case, the courts should not independently re-examine the basis for that decision. Accordingly, the Court accepts the Government's position that the Attorney General's actions were motivated, at least in part, by foreign policy considerations.

This does not mean, however, that the instant issue is necessarily nonjusticiable, as the ensuing discussion shows.

in the specific case, and of the possible consequences of judicial action." *Baker v. Carr, supra,* 369 U.S. at 211–212, 82 S.Ct. at 707.

Although courts must take care not to impinge upon the prerogatives and responsibilities of the political branches in their conduct of the country's foreign affairs, "[m]echanical or overbroad rules of thumb are of little value; what is required is a careful balancing of the interests involved and a precise understanding of the facts and circumstances of the particular case." *United States v. First National City Bank,* 396 F.2d 897, 901 (2 Cir. 1968). *See also Holmes v. Laird,* 148 U.S.App.D.C. 187, 459 F.2d 1211, 1215 (1972); *Drinan v. Nixon,* 364 F.Supp. 854, 856 (D.Mass.1973).

In *Baker v. Carr, supra,* and more recently in *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), the Supreme Court explored the contours of the political question doctrine and delineated and refined several criteria appropriate for determining whether a case presents a nonjusticiable political question. As these cases reflect the most authoritative pronouncements to date of the Supreme Court on that matter, the Court believes it appropriate to examine the issue presented here within the legal context fashioned by *Baker* and *Powell.*

In *Baker,* Justice Brennan, writing for the Court, reviewed at length numerous political question cases in order to expose the fundamental attributes of the doctrine. He concluded as follows:

"Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or

an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question." 369 U.S. at 217, 82 S.Ct. at 710.

Then, armed with this six-pronged test, Justice Brennan proceeded to determine whether any one of those formulations was "inextricable from the case at bar", *id.* at 217, 82 S.Ct. at 710; concluding that none was, he held that the issue presented in that case was justiciable, *id.* at 237, 82 S.Ct. at 720. Other courts, faced with what is alleged to be a political question, have invoked the criteria set forth in *Baker* and have followed Justice Brennan's procedure. *Sanders v. McClellan,* 150 U.S.App.D.C. 58, 463 F.2d 894, 897–899 (1972); *Atlee v. Laird, supra,* 347 F.Supp. at 689, 704–707. The Supreme Court itself reaffirmed the validity of the six-part *Baker* test in *Powell v. McCormack, supra,* 395 U.S. at 518–519, 548–549, 89 S.Ct. 1944, with particular attention to the textual commitment question. Thus, it seems clear that this Court should similarly determine whether any of the six *Baker* formulations of the political question doctrine are "inextricable from the case at bar"; if so, then this case is nonjusticiable.

 First, is there a "textually demonstrable constitutional commitment" of the conduct of the country's foreign affairs to a coordinate political department? There can be no doubt that the Constitution commits the foreign policy power to the executive and legislative branches, although no precise itemization of all possible prerogatives in this area is given. Art. 1, § 8; Art. 2, § 2. However, the fact that the political branches are charged with the responsibility for foreign affairs is not in itself determinative, if the Court is to heed the Supreme Court's admonition in *Baker,* quoted *supra,* that it is error to suppose that all cases touching upon foreign affairs are nonjusticiable. Clearly, the nonjusticiability of foreign relations

questions must turn on other factors, as the Supreme Court's analysis in *Baker* of the cases and relevant considerations in this area attests. 369 U.S. at 211–213, 82 S.Ct. 691. While the primary thrust of the political question discussion in *Powell*, a case concerning domestic affairs, understandably centered on the textual commitment test, here the focus is on foreign affairs. The Court believes that *Baker* and the other authorities on point mandate that when dealing with foreign affairs a court should direct its attention primarily to the remaining formulations in the *Baker* test.[23]

Second, is there a lack of "judicially discoverable and manageable standards" for resolving the instant case? The Court finds there is not. Petitioners argue that the actions of the executive deprived them of due process of law, specifically, of equal protection of the laws within the meaning of due process enunciated in *Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954). Judicial standards of due process and equal protection are well developed and familiar. *See Baker v. Carr, supra*, 269 U.S. at 226, 82 S.Ct. 691.

Third, nor does the Court feel that reaching the merits of the instant case would necessitate an "initial policy determination of a kind clearly for nonjudicial discretion." Congress had already established the underlying policy by enacting Sections 701–705 of the Nationality Act. Nor do any policy considerations which purportedly motivated the executive decision to deny Filipino servicemen the opportunity to be naturalized foreclose judicial consideration of this case. As the Supreme Court stated in *Baker* in the context of a Fourteenth Amendment Equal Protection claim,

"it has been open to courts since the enactment of the Fourteenth Amend-

---

**23.** At least one other court has concluded similarly. *See Atlee v. Laird, supra*, 347 F.Supp. at 703. Moreover, it is important to recall that the issues raised here center upon naturalization, a matter involving both domestic and foreign affairs, and that the power to formulate policy in this area is explicitly committed by the Constitution to Congress: "The Congress shall have Power * * * To establish an uniform Rule of Naturalization * * *." Art. I, § 8, cl. 4. Congress' intent to make naturalization available to Filipino members of the American armed forces, pursuant to its constitutional authority, was clearly expressed by enactment of Sections 701–705 of the Nationality Act.

Petitioners maintain that the admitted conflict between congressional and executive policy in this area is itself justification for the Court to consider the merits of their claim, notwithstanding the foreign relations aspect of this case. Apparently petitioners have in mind *dicta* of some courts to the effect that even in the conduct of the country's foreign affairs, the judiciary may intervene when the executive and Congress are in conflict. *Drinan v. Nixon, supra*, 364 F.Supp. at 858; *Massachusetts v. Laird*, 451 F.2d 26, 34 (1 Cir. 1971); *Atlee v. Laird, supra*, 347 F.Supp. at 694. *See also Orlando v. Laird*, 443 F.2d 1039, 1043 (2 Cir. 1971), *cert. denied*, 404 U.S. 869, 92 S.Ct. 94, 30 L.Ed.2d 113 (1971). In such a case, however, these political branches must be clearly and resolutely in opposition.

"In order to rise to the level of a constitutional question, however, the conflict be-tween the executive and legislative branches must be clear and at least apparently incapable of resolution, absent judicial intervention." *Drinan v. Nixon, supra*, 364 F.Supp. at 858.

The Court does not believe that that is the case here. While it is true that the executive decision effectively to deny Filipino servicemen the opportunity to exercise the right given them by Congress totally frustrated the legislative intent, the lack of any subsequent action from Congress calculated to reverse the effect of that executive conduct, Congress' own refusal to extend Sections 701–705 beyond the December 31, 1946, expiration date, and the eventual assignment of a naturalization officer to the Philippines in August, 1946, indicate that those branches were not so resolutely in opposition as to justify judicial intervention on that basis.

Furthermore, it appears that the doctrine permitting judicial intervention, if indeed there is such a doctrine, contemplates an on-going, contemporaneous conflict centered on current foreign policy. (The cases cited concerned the constitutionality of the Vietnam War.) It makes little sense for a court to find that a matter involving foreign affairs is presently justiciable merely because, many years ago, Congress and the executive differed on the proper policy to follow, when both those branches permitted the dispute to exhaust itself with the passage of time. Petitioners' claim is not justiciable on this ground.

ment to determine, if on the particular facts they must, that a discrimination reflects *no* policy, but simply arbitrary and capricious action." *Baker v. Carr, supra,* 369 U.S. at 226, 82 S.Ct. at 715.

Fourth, resolution of the instant case would not constitute an expression of the judiciary's lack of respect due coordinate branches of government, at least no more so than would any judicial inquiry into the constitutionality of executive conduct.

■ Nor, fifth, does the Court find an unusual need for unquestioning adherence to a political decision already made. Such a need in the context of this case could only arise from concern for the international consequences that are likely to flow from a decision on the merits. *See Atlee v. Laird, supra,* 347 F.Supp. at 702. The Court does not believe that Filipino-American relations in particular, or the foreign policy of the United States in general, are likely to be affected adversely by judicial consideration of the merits of the instant case. As the Government repeatedly called to the attention of the Court, the executive action complained of here occurred nearly thirty years ago and reflected decisions based upon facts and policy objectives then existent. The Court does not perceive any reason why it must continue to adhere unquestioningly to those much earlier executive decisions.[24]

Sixth, for similar reasons, the Court does not feel that adjudication of the instant case would be potentially embarrassing to the United States because of "multifarious pronouncements by various departments on one question." Once again, the Court emphasizes that this case concerns the administration of a statute which expired nearly thirty years ago. It is hardly surprising that neither Congress nor the executive has spoken in recent years on the issues raised here. This is simply not the kind of case where judicial inquiry risks potential embarrassment for the United States in the conduct of its foreign affairs due to inconsistent expressions from the several branches of our Government.

The Court has carefully considered the cases relied upon by the Government in support of its contention that petitioners' claim is nonjusticiable, *United States v. Curtiss-Wright Export Corp., supra,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255, *United States ex rel. Knauff v. Shaughnessy, supra,* 338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317, and *Harisiades v. Shaughnessy, supra,* 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586, and finds them unpersuasive. These cases antedate *Baker v. Carr, supra.* Although *Baker* did not purport to overrule prior case law, it did implicitly disapprove of such "sweeping statements" as that in *Oetjen v. Central Leather Co., supra,* 246 U.S. at 302, 38 S.Ct. 311,[25] or that quoted by the Government

24. Surely the Court should not conclude that there exists a need for unquestioning adherence to a prior political decision on the grounds that other Filipino ex-servicemen, including those presently in the Philippines, would logically be entitled to claim the benefits of a decision finding that these petitioners were denied their constitutional rights. The Government has alluded to thousands of Filipinos who would be so entitled, while petitioners maintain that the number is much smaller. The actual number is irrelevant, for no decision delineating fundamental constitutional rights should turn on the number of persons who may be affected thereby. Moreover, no danger exists that American-Filipino relations would be harmed by a decision of the Court entitling some present residents of the Philippines to claim the right to naturalization pursuant to Section 702. As a sovereign independent state, the Philippine Islands is fully capa-

ble of instituting domestic policies in response to such a decision which would safeguard what it perceives to be its interests. Thus, for example, unlike 1945, the Philippine Government need not fear the loss of many of its citizens by emigration to the United States, for if it chose it could easily restrict or control their exit from the Philippines. The Court does not believe that the preservation of amicable relations between the United States and the Philippine Islands necessitates that it adhere unquestioningly to the earlier executive decision.

25. "The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative—'the political' Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision."

from *United States v. Curtiss-Wright Export Corp., supra,* 299 U.S. at 319–320, 57 S.Ct. 216. The Court believes that it must give far greater weight to the relatively recent and exhaustive discussion of the political question doctrine set forth in *Baker* than to the earlier authority cited by the Government.

■ Having concluded that none of the formulations of the political question doctrine set forth in *Baker* is inextricable from the case at bar, the Court holds that petitioners' claim of a denial of due process of law presents a justiciable question.

*Petitioners Have Been Denied Due Process of Law*

The Court now turns to the issue at the heart of petitioners' claim, namely, that the action of the Commissioner of the INS in 1945–1946 deprived them of due process of law. More specifically, they argue that the Commissioner's decision, approved by the Attorney General, to withhold from servicemen stationed in the Philippines the opportunity to become naturalized under Sections 701–702 of the Nationality Act of 1940 discriminated against Filipinos as a class. As the only class forced to suffer such discrimination, petitioners contend that they were denied the equal protection of the laws.[26] Further, they argue that the discrimination was based on race, alienage or nationality—suspect classifications—and must therefore be subjected to strict judicial scrutiny, and can only be justified by compelling governmental interest.

Petitioners seek to draw support for their position from the long line of cases holding that state action which discriminates against persons resident in the United States on the basis of alienage or

national origin is unconstitutional unless justified by compelling state interest. *See, e. g., Yick Wo v. Hopkins,* 118 U.S. 356, 374, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *Hirabayashi v. United States, supra,* 320 U.S. at 100, 63 S.Ct. 1375; *Korematsu v. United States,* 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194 (1944); *Oyama v. California,* 332 U.S. 633, 646, 68 S.Ct. 269, 92 L.Ed. 249 (1948); *Takahashi v. Fish Comm'n.,* 334 U.S. 410, 420, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948); *Graham v. Richardson,* 403 U.S. 365, 372, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); *Sugarman v. Dougall,* 413 U.S. 634, 642, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973); *In re Griffiths,* 413 U.S. 717, 721–722, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973). The Government, on the other hand, argues that no discrimination based on race or alienage occurred here, and, in any event, no suspect classification is present since this case concerns the naturalization of aliens located outside the United States, not the treatment of aliens within this country. The Government points out that the immigration and naturalization laws themselves draw distinctions based upon race, alienage and ethnic origin, and that the executive branch is free to admit or exclude aliens as it sees fit. *See United States ex rel. Knauff v. Shaughnessy, supra,* 338 U.S. at 543, 70 S.Ct. 309; *Takahashi v. Fish Comm'n., supra,* 334 U.S. at 418, 68 S.Ct. 1138. The Government concludes that petitioners' reliance upon *Yick Wo v. Hopkins* and its progeny is inapposite; that the compelling governmental interest test is inappropriate for this case; and that petitioners were not denied equal protection of the laws under the rational relationship test.

In the Court's opinion, neither the legal theory advanced by petitioners, nor

---

**26.** Petitioners, of course, do not base their constitutional argument on the Equal Protection Clause of the Fourteenth Amendment, since no state action is present here. Rather, their equal protection claim is founded on the principle that the unequal application of a law among those entitled to be treated alike may violate the Due Process Clause of the Fifth Amendment. As the Supreme Court recognized in *Bolling v. Sharpe, supra,* 347 U.S. at 499, 74 S.Ct. at 694, while "equal protection of the laws" and "due process of law" are not always interchangeable phrases, "discrimination may be so unjustifiable as to be violative of due process." *See also Hirabayashi v. United States,* 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943).

that of the Government, accurately fits the facts of this case. For although petitioners do not stand in the precise position of persons resident in the United States, neither can their constitutional rights be defined by reference to those of aliens located outside the United States. It is important to recall that until July 4, 1946, petitioners were *American nationals* residing in American territory, subject to the laws of this country, and to the jurisdiction of our insular courts and Supreme Court. Philippine Independence Act, §§ 2(a)(1), 2(a)(13), 2(a)(14) and 7(6). Careful attention to these facts is imperative in evaluating petitioners' constitutional claim.

Especially significant is the fact that petitioners were located in American territory at the time the alleged deprivation of their constitutional rights occurred. Ever since *Yick Wo v. Hopkins, supra,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220, important constitutional guarantees have been extended to persons other than American citizens. However, the Supreme Court was "at pains to point out that it was the alien's presence within its territorial jurisdiction that gave the Judiciary power to act", *Johnson v. Eisentrager,* 339 U.S. 763, 771, 70 S.Ct. 936, 940, 94 L.Ed. 1255 (1950), as the language of *Yick Wo* makes clear: "These provisions [of the Fourteenth Amendment] are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality." 118 U.S. at 369, 6 S.Ct. at 1070. To be sure, residence in the Philippines was not precisely equivalent to location within the United States; [27] nevertheless, Filipinos were protected by fundamental guarantees of the Constitution, and the Supreme Court retained jurisdiction to

review all decisions of the courts of the Philippines by the terms of the Philippine Independence Act, §§ 2(a)(13) and 7(6). These considerations alone would seem to indicate that petitioners' status cannot properly be analogized to that of aliens located outside of the United States or seeking leave from the executive to enter this country, but corresponds instead to that of non-citizens present in the United States.

Furthermore, in determining the appropriate degree of protection the Constitution accords a person who is not an American citizen, the Supreme Court has evidenced a sensitive appreciation for the nature of the relationship between the individual and the United States, and the intensity of his identification with this country. In discussing the rights of aliens, for example, the Court stated:

> "The alien, to whom the United States has been traditionally hospitable, has been accorded a generous and ascending scale of rights as he increases his identity with our society. Mere lawful presence in the country creates an implied assurance of safe conduct and gives him certain rights; they become more extensive and secure when he makes preliminary declaration of intention to become a citizen, and they expand to those of full citizenship upon naturalization." *Johnson v. Eisentrager, supra,* 339 U.S. at 770, 70 S.Ct. at 940.

On other occasions, that Court has emphasized the strong ties that even an alien often feels toward his country of domicile, the "vital interest" he possesses in the "economic, social and political well-being" of his community, *Oyama v. California, supra,* 332 U.S. at 665, 68 S.Ct. at 284 (concurring opinion of Mur-

---

27. Note, however, that the Supreme Court virtually equated the position of a petitioner for a writ of habeas corpus located in the Philippines prior to 1946 with that of an alien petitioner in custody within the United States:

"By reason of our sovereignty at that time over these insular possessions, Yamashita [the petitioner in the Philippines] stood

much as did Quirin [the petitioner in the United States] before American courts. Yamashita's offenses were committed on our territory, he was tried within the jurisdiction of our insular courts and he was imprisoned within territory of the United States." *Johnson v. Eisentrager, supra,* 339 U.S. at 780, 70 S.Ct. at 945.

# 950

phy, J.), and corresponding responsibility he assumes to "pay taxes, support the economy, serve in the Armed Forces, and contribute in myriad other ways to our society." *In re Griffiths, supra,* 413 U.S. at 722, 93 S.Ct. at 2855. Indeed, courts seldom inquire into a litigant's status as citizen or alien since "the civil and property rights of immigrants or transients of foreign nationality so nearly approach equivalence to those of citizens * *." *Johnson v. Eisentrager, supra,* 339 U.S. at 771, 70 S.Ct. at 940.

■ It would be anomalous to hold that these petitioners, who during the relevant time period were American nationals residing in American territory and, indeed, were loyally defending this country through service in our armed forces, should be accorded substantially weaker and less extensive protection than is enjoyed by a transient of foreign nationality. The Court is convinced that the facts of this case, when viewed against the trend of judicial authority, lead inescapably to the conclusion that petitioners are entitled to the same judicial determination of their constitutional claim as would be given a due process claim of resident non-citizens.

■ The law is clear that classifications based on alienage, nationality or race are inherently suspect. "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Hirabayashi v. United States, supra,* 320 U.S. at 100, 63 S.Ct. at 1385.

"[T]he Court's decisions have established that classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny." *Graham v. Richardson, supra,* 403 U.S. at 371–372, 91 S.Ct. at 1852 (footnotes omitted).

Courts must subject such classifications "to the most rigid scrutiny", *Korematsu v. United States, supra,* 323 U.S. at 216, 65 S.Ct. 193; "only the most exceptional circumstances can excuse discrimination" on such grounds, *Oyama v. California, supra,* 332 U.S. at 646, 68 S.Ct. at 275. In order to justify the use of a suspect classification, the Government must show that "its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is 'necessary * * * to the accomplishment' of its purpose or the safeguarding of its interest." *In re Griffiths, supra,* 413 U.S. at 721–722, 93 S.Ct. at 2855 (footnotes omitted).[28]

Seldom, indeed, has a state or the federal government been able to meet the burden placed on it to justify discrimination based on alienage or ethnic origin. When it has met that burden, the Supreme Court has made clear that the circumstances were truly exceptional. Thus, for example, in upholding the constitutionality of the restrictions imposed during World War II by an Executive Order of the President on persons of Japanese ancestry, the Court emphasized the presence of "circumstances of direst emergency and peril", *Korematsu v. United States, supra,* 323 U.S. at 220, 65 S.Ct. at 195; the grave "danger of espionage and sabotage, in time of war and of threatened invasion", *Hirabayashi v. United States, supra,* 320 U.S. at 100, 63 S.Ct. at 1385; and that "[n]othing short of apprehension by the proper military authorities of the gravest imminent danger to the public safety" could justify the governmental action taken, *Korematsu v. United States, supra,* 323 U.S. at 218, 65 S.Ct. at 195.

■ The Court has carefully considered the Government's position in the instant case, and concludes that the Government has not met its burden of justifying the discriminatory executive

---

**28.** "The state interest required has been characterized as 'overriding,' [citation] 'compelling,' [citation] 'important,' [citation] or 'substantial.' [citation]. We attribute no particular significance to these variations in diction." *In re Griffiths, supra,* 413 U.S. at 722 n. 9, 93 S.Ct. at 2855.

conduct involved here. Although the Court has no doubt that the actions of the Commissioner of the INS were motivated by reasonable concern for the maintenance of amicable relations between the United States and the Philippine Islands, that concern alone, when considered in light of the suspect nature of the classification herein, and the strictness of the applicable constitutional standard, is insufficient justification for violating petitioners' rights.

Finally, while it in no way serves as a legal basis for this decision, the Court cannot ignore, nor will the American public forget, the heroic sacrifices made by these and other Filipinos during World War II. Their courage and valor at Corregidor, during the Bataan death march, and throughout the Japanese occupation of the Philippine Islands stand as the finest examples of the dedication of free men opposing and resisting tyranny imposed upon them by an outside belligerent force. Petitioners' love of freedom and dedicated defense of this country during time of war truly show that "[l]oyalty is a matter of the heart and mind, not of race, creed, or color." *Ex Parte Endo*, 323 U.S. 283, 302, 65 S.Ct. 208, 218, 89 L.Ed. 243 (1944).

The Court holds that the failure of the Government to have stationed in the Philippine Islands a representative of the INS authorized to naturalize members of the American armed forces pursuant to Section 702 of the Nationality Act of 1940 during all of the time those statutory rights were available denied petitioners due process of law.

## CATEGORY III

Petitioners in this category are in the same position as those in Category II except that they have so far been unable to provide adequate proof, within the terms of Section 701 of the Nationality Act of 1940, of their military service in either the Commonwealth Army or the Philippine Scouts. While it appears unlikely that they will be able to do so now, these petitioners will be given ninety days from the date of this order to produce the necessary proof of their service to the INS, or their petitions will be denied.

## ORDER

### ADDENDUM

Since the issuance of its Memorandum of Opinion herein on November 10, 1975, the Court has read with care the en banc decision of the United States Court of Appeals for the Ninth Circuit, dated October 31, 1975, reversing the first appellate decision in *Santiago v. INS*, 526 F.2d 488 (9 Cir. 1975). That reversal in no way affects the outcome reached here, for petitioners in Category I are still entitled to naturalization on two independent grounds. First, this Court held that these petitioners constructively filed their petitions for naturalization prior to the expiration date of Sections 701–705. Second, and more importantly, these petitioners, like those in Category II, were denied due process of law by the Immigration and Naturalization Service and are therefore entitled to naturalization on constitutional grounds.