694 F.2d 603
 Re Naturalization of Renato Leopoldo BARRETTO, Petitioner-Appellant,
v.
UNITED STATES of America, Respondent-Appellee.
Re Naturalization of Antolin Punsalan PANGILINAN, et al.,
Petitioners-Appellants,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent-Appellee.
Re Naturalization of Mario Valderrama LITONJUA, Petitioner-Appellant,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent-Appellee.
 Nos. 80-4441, 80-4543 and 81-5427.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 13, 1982.
Decided Dec. 10, 1982.
 
 Robert Grant Wealleans, Los Angeles, Cal., Donald L. Ungar, San Francisco, Cal., and Robert A. Mautino, San Diego, Cal., argued, for petitioners-appellants; Popkin, Shamir & Golan, Los Angeles, Cal., Simmons & Ungar, San Francisco, Cal., Baxley, Mautino & Ray, San Diego, Cal., on brief.
 John T. Bannon, Jr., Dept. of Justice, General Litigation & Legal Advice Section, Washington, D.C., argued, for respondent-appellee; Frank O. Bowman, III, Dept. of Justice, General Litigation & Legal Advice Section, Washington, D.C., on brief.
 Appeals from the United States District Courts for the Northern and Southern Districts of California.
 Before SCHROEDER, FLETCHER and NORRIS, Circuit Judges.
 NORRIS, Circuit Judge:
 
 
 1
 These are three more in a series of Filipino war veteran cases arising under Secs. 701-705 of the Nationality Act of 1940, Pub.L. No. 76-853, Ch. 199, 54 Stat. 1137, as amended by Pub.L. No. 77-507 Sec. 1001, 56 Stat. 182 ("1940 Act"). Appellants are all Filipino veterans who served honorably in the United States armed services during World War II. They claim that they are entitled to United States citizenship under the 1940 Act because they were denied due process of law when the United States Attorney General removed an authorized naturalization officer from the Philippines in October 1945. They also contend that the government is collaterally estopped by the judgment in Matter of Naturalization of 68 Filipino War Veterans, 406 F.Supp. 931 (N.D.Cal.1975) ("68 Filipinos") from relitigating their due process claims. The district courts denied all petitions. We reverse and grant the petitions.
 
 
 2
 * A.
 
 
 3
 The history of this litigation is discussed at length in Mendoza v. United States, 672 F.2d 1320 (9th Cir.1982) and 68 Filipinos. We repeat it briefly here.
 
 
 4
 In March 1942, Congress amended the Nationality Act of 1940, Pub.L. No. 76-853, 54 Stat. 1137, to provide for naturalization of non-citizens who served honorably in the United States armed forces. 56 Stat. 182 (repealed 66 Stat. 280, June 27, 1952). As amended, the 1940 Act exempted alien servicemen from certain of the usual naturalization requirements, id. at Sec. 701, and provided for overseas naturalization of servicemen on active duty. Id. at Sec. 702. As further amended, the Act required that all petitions for naturalization under Secs. 701 and 702 be filed by December 31, 1946. Act of Dec. 28, 1945, Pub.L. No. 79-270, Sec. 202(c)(1), 59 Stat. 658 (repealed 66 Stat. 280, June 27, 1952).
 
 
 5
 In early August 1945, the Immigration and Naturalization Service (INS) designated George Ennis, Vice Consul in Manila, to naturalize Filipino servicemen under the 1940 Act. But when the Philippine government expressed concern that naturalizations under the Act would drain the country of much-needed manpower, the Attorney General revoked Vice Consul Ennis' naturalization authority. As a result, between October 1945 and August 1946, no INS official was present in the Philippines to naturalize eligible servicemen.
 
 B.
 
 6
 In 1975, the claims of 68 Filipino war veterans, whose petitions for naturalization pursuant to the 1940 Act had been denied by the INS, were joined in district court. Matter of Naturalization of 68 Filipino War Veterans, 406 F.Supp. 931 (N.D.Cal.1975) (Renfrew, J.). Judge Renfrew divided the petitioners into two relevant categories: those who had taken some action to be naturalized in the Philippines prior to December 31, 1946, but had not been processed by the INS (Category I), and those who had taken no action to be naturalized in the Philippines (Category II)[1]. Judge Renfrew granted the petitions of "Category I" veterans on the alternate grounds that the government had engaged in "affirmative misconduct," which estopped it from contesting the veterans' petitions, and that the petitions had been "constructively filed" within the statutory deadline. Id. at 937-40. Judge Renfrew granted the petitions of "Category II" veterans on the ground that withdrawal of the naturalization examiner from the Philippines violated the equal protection component of the Due Process Clause of the Fifth Amendment. Id. at 951. The government filed a notice of appeal, but then withdrew it, permitting the judgment to become final.
 
 II
 A.
 
 7
 Appellant Pangilinan is one of fourteen Filipino veterans whose petitions were consolidated on appeal. We treat all fourteen as "Category II" veterans on the basis of a stipulation that their petitions raise issues identical to those raised by the "Category II" veterans in 68 Filipinos. All served honorably in the United States armed forces; all were in the Philippines on active service for some or all of the time that naturalization authority was withdrawn; and none took steps to become naturalized while in the Philippines.
 
 
 8
 We also conclude that appellant Litonjua should be treated as a "Category II" veteran[2]. He enlisted in the United States Navy in 1941 and became a prisoner of war in 1942. After his release in early 1945, Litonjua rejoined his unit in the Philippines, where he remained in active service until he was honorably discharged on April 10, 1946.[3] Thus, he was in the Philippines and eligible to be naturalized during a six month period (October 1945 to April 1946) when there was no INS official available to process his petition.
 
 
 9
 Because the theory of Barretto's claim differs from that of Pangilinan and Litonjua, we treat the status of his naturalization petition in Part III.
 
 B.
 
 10
 Although Litonjua and the Pangilinan petitioners are "Category II" veterans, the district judges below declined to estop the government from relitigating the issues decided in 68 Filipinos. Instead, they reached the merits of appellants' constitutional claims, and, relying on Olegario v. United States, 629 F.2d 204 (2d Cir.1980), cert. denied, 450 U.S. 980, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981), denied the veterans' petitions. In so doing, they acted without the benefit of our decision in Mendoza v. United States, 672 F.2d 1320 (9th Cir.1982), in which we affirmed a district court judgment collaterally estopping the government on precisely these facts. Accordingly, the threshold legal question in the Litonjua and Pangilinan appeals is the effect of our decision in Mendoza on the question whether the government should be precluded from relitigating issues decided in 68 Filipinos[4].
 
 
 11
 The facts presented in Mendoza were similar to those at issue here. Dr. Mendoza, like Litonjua and the Pangilinan petitioners, qualified as a "Category II" veteran. He served in the United States armed forces from December 1, 1941 until June 30, 1946. During that time, he was captured by the Japanese and survived the Bataan Death March. Once released by the Japanese, he was sent to the United States for army medical training; six months later, he returned to the Philippines, where he remained for the duration of his service. At no point during that time--indeed, not until 1978--did he make any effort to become an American citizen. The district court, in granting Dr. Mendoza's petition for naturalization, applied the doctrine of collateral estoppel based upon the guidelines set out in Parklane Hosiery v. Shore, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), which encouraged use of collateral estoppel offensively when its application would not be unfair to the defendant.[5] We held that the district court did not abuse its discretion because the "dual purpose of protecting litigants from the burden of relitigating an identical issue ... and of promoting judicial economy by preventing needless litigation," id. at 326, 99 S.Ct. at 649, would be served by barring the government from relitigating issues decided in 68 Filipinos. Mendoza, 672 F.2d at 1325-26. We were unpersuaded by the government's argument that it would be unfair[6] to grant Dr. Mendoza's naturalization petition without reaching the merits of his equal protection claim.
 
 
 12
 To support its claim of unfairness, the government in Mendoza first asserted that it had prematurely withdrawn its appeal in 68 Filipinos because it had grossly underestimated the number of Filipinos who would become eligible for naturalization under its holding. We found no record support, however, for the contention that, after withdrawing its appeal, the government discovered that as many as 60,000-80,000 Filipino veterans could be expected to petition for naturalization in reliance upon Judge Renfrew's decision in 68 Filipinos. The government, for instance, did not indicate how many of those potential applicants had in fact petitioned after 68 Filipinos was decided in 1975, or how many of those veterans actually eligible to petition were realistically likely to do so nearly 40 years after the end of World War II. In fact, the record suggested that only a very few Filipinos had taken advantage of the opportunity; congressional testimony by INS officials indicated that no more than 100 Filipinos had applied for naturalization as of 1978. 672 F.2d at 1327. In the cases now before us, the government has made no effort to challenge that testimony or otherwise bolster its claim of unfairness; in fact, at oral argument the government formally abandoned its contention that the issues in 68 Filipinos should be relitigated because it had grossly miscalculated the impact of that decision on the number of naturalization petitions from Filipino war veterans it could expect to receive.
 
 
 13
 In Mendoza, we also rejected the government's argument that collateral estoppel should be invoked offensively only against private litigants. Id. at 1329. Acknowledging that relitigation by the government might be warranted in cases raising significant issues of public policy or constitutional law, we nonetheless found no compelling need for relitigation in that case.
 
 
 14
 The merits of these arguments were thus fully considered in Mendoza, and need not be reconsidered here. We now address the government's sole remaining argument[7] that giving collateral estoppel effect to 68 Filipinos would insulate significant constitutional issues from appellate review. See Montana v. United States, 440 U.S. 147, 163, 99 S.Ct. 970, 978, 59 L.Ed.2d 210 (1979) (cautioning that collateral estoppel should not be applied lightly where to do so might freeze constitutional doctrine on significant national issues); Mendoza, 672 F.2d at 1329-30. Although we readily agree that the constitutional issues raised in 68 Filipinos are significant, we believe that the government overstates the precedential value of 68 Filipinos, which is, after all, a district court opinion rendered on extraordinary facts. The events giving rise to the 68 Filipinos claims occurred over 35 years ago in the unusual context of a war-related immigration statute and the impending independence of the Philippines; it is highly improbable that the government will again be involved in litigation involving analogous facts. And if legal issues analogous to those resolved in 68 Filipinos arise on different facts, the government would be free to relitigate them, see Commissioner v. Sunnen, 333 U.S. 591, 601-02, 68 S.Ct. 715, 721, 92 L.Ed. 898 (1948); Montana v. United States, 440 U.S. at 162-63, 99 S.Ct. at 978, burdened only by a district court opinion as related precedent.[8] Thus, application of collateral estoppel would not freeze constitutional doctrine on important national issues or otherwise inhibit healthy development of the law.
 
 
 15
 Absent a change in circumstances, which the government has neither claimed nor demonstrated, therefore, Mendoza must control the disposition of the Pangilinan and Litonjua appeals. We conclude that our determination in Mendoza that it is not unfair to estop the government from contesting the naturalization petitions of "Category II" veterans is binding in these cases as stare decisis. To permit district courts in the Ninth Circuit to redetermine the issue of fairness after our decision in Mendoza --and thus treat identically situated "Category II" veterans differently from Dr. Mendoza--would be abhorrent to the principles of consistency and fairness that underlie the doctrine of stare decisis, see Thomas v. Washington Gas Light Co., 448 U.S. 261, 272, 100 S.Ct. 2647, 2656, 65 L.Ed.2d 757 (1980), and would undermine "public faith in the judiciary as a source of impersonal and reasoned judgments." Moragne v. States Marine Lines, Inc. 398 U.S. 375, 403, 90 S.Ct. 1772, 1789, 26 L.Ed.2d 339 (1970).
 
 
 16
 For the foregoing reasons, therefore, we hold that the government is collaterally estopped from relitigating against these "Category II" veterans the issues decided in 68 Filipinos[9]. This result is consistent with the guidelines set out in Parklane Hosiery. Once it has been conclusively determined that collateral estoppel is not unfair to a defendant, and does not reward a plaintiff who could easily have joined the initial suit, we believe that, absent a change of circumstances, Parklane Hosiery requires its application as a matter of law. By deciding as we do, we thus adhere both to the standards set in that case and to the reasoning of our Mendoza decision.
 
 III
 
 17
 We now turn to Appellant Barretto's petition. Barretto joined the United States armed forces in August 1941. He saw active duty in Central Luzon, Bataan and Corregidor and was imprisoned by the Japanese from May 1942 to November 1943. In February 1945, Barretto was assigned to flight training duty in the United States. While there, he tried to file a preliminary application for naturalization under the 1940 Act, but the INS would not accept his application because it lacked the signature of his commanding officer.[10] Barretto returned to the Philippines on June 10, 1946 and was discharged from the United States armed forces on June 30, 1946.
 
 
 18
 Barretto filed this petition for naturalization in June 1977, and the government withdrew its 68 Filipinos appeal in November 1977. Because several Filipino veterans apparently agreed with the INS to hold their claims in abeyance pending the outcome of the appeal in 68 Filipinos, the government has adopted a "grandfather" policy of granting any petitions filed by "Category II" veterans before withdrawal of the 68 Filipinos appeal.[11] Brief of Respondent-Appellee at 13 n. 21; Supplemental Brief of Respondent-Appellee at 2-6. See, e.g., United States v. Domingo v. Avena, No. --- (N.D.Cal. Jan. 17, 1979), appeal withdrawn, No. 79-4361 (9th Cir. --- 1979). At oral argument, the government stipulated that it would withdraw its opposition to Barretto's petition if this court finds that Barretto is a "Category II" veteran within the meaning of 68 Filipinos.
 
 
 19
 The district court held that Barretto is not a "Category II" veteran because he was not prejudiced by the government's withdrawal of naturalization authority from the Philippines. The district court reasoned that Barretto was in the United States during much of the period that a naturalization officer was absent from the Philippines; that Barretto was stationed in the Philippines and eligible for naturalization under Sec. 702 for only twenty days of that period; and that Barretto testified that he made no attempt to inquire about naturalization after he returned to the Philippines.
 
 
 20
 We cannot agree that Barretto is disqualified from relief because he was in the Philippines and eligible for naturalization under Sec. 702 for only twenty days. In Mendoza, we found that Dr. Mendoza's presence in the Philippines for as much as three months, after having been in the United States for several months, was sufficient to implicate Dr. Mendoza's due process rights, 672 F.2d at 1326 n. 8; we know of no principled basis--and the government offers none--for drawing a line between three months in Dr. Mendoza's case and three weeks in this case. If the government's conduct violated the constitutional rights of Filipinos serving in the United States armed forces in the Philippines, it violated their rights whether they were in the Philippines for nine months or nine days.
 
 
 21
 Nor do we agree that Barretto's failure to inquire about naturalization upon his return to the Philippines disqualifies him from relief as a "Category II" veteran. None of the "Category II" veterans in 68 Filipinos had taken steps to be naturalized, and we see no reason to distinguish Barretto's inaction from theirs simply because Barretto knew of his right to naturalization under the 1940 Act.[12] Barretto has shown that he would have been eligible for naturalization in the Philippines if an INS officer had been present, and that he wished to avail himself of his right to naturalization. He has thus demonstrated "a 'distinct and palpable injury' ... [and] a 'fairly traceable' causal connection between the claimed injury and the challenged conduct," Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978) (citations omitted), and he has standing as a "Category II" veteran to challenge the government's actions. Thus, pursuant to the government's "grandfather" policy and its stipulation in court, we hold that Barretto is legally entitled to be naturalized.
 
 
 22
 The judgments of the district courts are REVERSED and the naturalization petitions of all appellants in these consolidated appeals are GRANTED.
 
 
 
 [1]
 A third category included Filipinos who could not prove that they had been eligible for naturalization under Secs. 701-705
 
 
 [2]
 Although it did not raise the argument in its brief, the government asserted at oral argument that Litonjua is not a "Category II" veteran because he sought naturalization in Seattle after his discharge from the military. The argument is meritless. Litonjua was in the Philippines for six of the nine months that naturalization authority was withdrawn and, like the "Category II" veterans in 68 Filipinos, he made no effort during that period to be naturalized under Sec. 702. See Mendoza, 672 F.2d at 1326 n. 8
 
 
 [3]
 Shortly thereafter, Litonjua went to Seattle, Washington as a civilian employee of the United States Army Transport Service. While in Seattle, he took steps to become naturalized under the 1940 Act, but, for reasons that are not clear on the record, the petition process was not completed. Litonjua is not, however, a "Category I" veteran, because the "Category I" veterans in 68 Filipinos sought naturalization under Sec. 702 while still on active duty in the Philippines. Litonjua claims that he should nonetheless be deemed to have constructively filed his petition before the statutory deadline. Because we resolve his case on an alternate ground, we do not reach this issue
 
 
 [4]
 Because the relevant facts are not in dispute, this court is equipped to decide whether, in light of Mendoza, collateral estoppel should be invoked offensively against the government in the Pangilinan and Litonjua cases. See Starker v. United States, 602 F.2d 1341 (9th Cir.1979). In Starker, as here, the district court declined to estop the government collaterally, but did so without the benefit of the Supreme Court's decision in Parklane Hosiery v. Shore, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). Rather than remand to the district court for reconsideration in light of Parklane Hosiery, our court made an independent determination to apply collateral estoppel against the government, reasoning that "we [could] discern no useful purpose in a remand for the exercise of the discretion called for in Parklane Hosiery. This court can apply to agreed facts the discretionary standards set out in that opinion." Starker, 602 F.2d at 1349. Similarly, no useful purpose would be served by a remand to determine on the basis of the agreed facts the legal effect of our decision in Mendoza on the Litonjua and Pangilinan petitions
 
 
 [5]
 The Court in Parklane Hosiery identified several potential sources of unfairness: if potential plaintiffs sit on the sidelines until another plaintiff has obtained a favorable judgment; if the second action involves substantially higher stakes than the first, or affords the defendant procedural opportunities not originally available; or if circumstances have changed by the time of the second suit. 439 U.S. at 330-31, 99 S.Ct. at 651-52
 
 
 [6]
 The government did not contend that Dr. Mendoza had adopted a "wait and see" attitude to reap the fruits of the earlier litigation; we thus did not reach the issue whether application of collateral estoppel would have been inappropriate on that score
 
 
 [7]
 As in Mendoza, the government does not suggest that Litonjua and the Pangilinan petitioners could have joined the 68 Filipinos litigation and thus that they are unfairly profiting from its results
 
 
 [8]
 Moreover, since the Second Circuit has declined to collaterally estop the government, and has disagreed with 68 Filipinos on the merits, Olegario v. United States, 629 F.2d 204, 214-15, 130 (2d Cir.1980), cert. denied, 450 U.S. 980, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981), there is a conflict in the circuits, and courts addressing analogous legal issues on new facts will have the benefit of both opinions
 
 
 [9]
 We do not hold that the trial judges, who ruled without the benefit of Mendoza, abused their discretion in denying collateral estoppel. Rather, we hold that, in light of Mendoza, the government is now estopped as a matter of law
 
 
 [10]
 Barretto was unable to obtain the signature because his commanding officer was in the Philippines. Barretto argues that the signature was required only on the filing of a formal petition and that the refusal to accept his preliminary application was "affirmative misconduct," and that the government is thus estopped from contesting his petition. Because we decide his case on an alternate ground, we do not reach this issue
 
 
 [11]
 The government has also adopted a policy of granting all petitions of "Category I" veterans, whether filed before or after withdrawal of the appeal in 68 Filipinos. Brief of Respondent-Appellee at 13 n. 21
 
 
 [12]
 The opinion in 68 Filipinos does not indicate whether the "Category II" veterans did or did not know of their rights under Secs. 701-705. In any event, the record does not show that Barretto knew there was a possibility of being naturalized while outside the United States. Thus, even if relevant, we could draw no negative inference from his failure to seek naturalization in the Philippines