Jaime Agustin **AGCAOILI, et al.,**
**Plaintiffs–Appellants,**

v.

Ernest E. **GUSTAFSON, et al.,**
**Defendants–Appellees.**

No. 86–5830.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 9, 1987.

Decided April 4, 1988.

Russell Marshak (Brian E. Schield, on brief), Popkin, Shamir & Golan, Los Angeles, Cal., for plaintiffs-appellants.

Ian Fan, Asst. U.S. Atty., Los Angeles, Cal., for defendants-appellees.

Before BROWNING, Chief Judge, FLETCHER and POOLE, Circuit Judges.

FLETCHER, Circuit Judge:

Appellants, Filipinos who served in the United States Armed Forces during World War II, brought this mandamus action to compel the Immigration and Naturalization Service (INS) to process their applications for naturalization, to schedule them for preliminary examinations, to conduct investigations, to make recommendations to the district court concerning their eligibility for naturalization, and to schedule them for final hearings before the district court, in accordance with the Immigration and Nationality Act (INA). The district court denied both parties' motions for summary judgment, holding that the outcome would be determined by the final decision in *Pangilinan v. INS*, 796 F.2d 1091 (9th Cir. 1986), *reh'g denied*, 809 F.2d 1449 (9th Cir.1987), *cert. granted*, —— U.S. ——, 108 S.Ct. 66, 98 L.Ed.2d 30 and stayed the action until a final decision in *Pangilinan* is rendered. At the time of the district court's order, the opinion in *Pangilinan* had not been filed. The applicants appeal on the ground that *Pangilinan* is not controlling, and assert that they are entitled to summary judgment in their favor.

## FACTS

The appellants are 63 Filipinos who served in the United States Armed Forces during World War II. The majority of the appellants reside in the Philippines, although approximately 23 of them live in the United States. The appellants have

applied for naturalization with the Los Angeles District Office of the INS, under the provisions of the Second War Powers Act of 1942, which amended the Nationality Act of 1940 by adding sections 701 and 702 to the Act. Nationality Act of 1940, Pub.L. No. 76–853, 54 Stat. 1137, *as amended by* the Second War Powers Act, section 1001, Pub.L. No. 77–507, 56 Stat. 182.

Sections 701 and 702 exempted non-citizens who served in the United States Armed Forces from customary naturalization requirements, such as five years of residence in the United States and proficiency in the English language. They were also excused from the requirement that they be naturalized by a court in the United States.

By its terms, the Second War Powers Act expired on December 31, 1946. However, after that date certain Filipino veterans have been found to be entitled to naturalization under its provisions. In *In re Naturalization of 68 Filipino War Veterans,* 406 F.Supp. 931 (N.D.Cal.1975), Judge Renfrew devised a classification system for analyzing the claims. Category I applicants include those veterans who took affirmative steps to be naturalized before the December 31, 1946, statutory cut-off date. Category II consists of veterans who were eligible for naturalization under the 1940 Act and were in the Philippines from October 1945 to August 1946, but who did not take affirmative steps to be naturalized before December 31, 1946. Category III veterans could not prove that they were eligible for naturalization under the 1940 Act. Judge Renfrew held that both Category I and Category II veterans were eligible for naturalization after the cut-off date.

The government has adopted a policy of granting all petitions of Category I veterans, *Barretto v. United States,* 694 F.2d 603, 608 n. 11 (9th Cir.1982), *vacated on other grounds, INS v. Litonjua,* 465 U.S. 1001, 104 S.Ct. 990, 79 L.Ed.2d 224 (1984), and of granting the petitions of Category II veterans that were filed before the government's withdrawal of its appeal in *68 Filipinos* in November 1977. *Id.* at 608. When this appeal was filed, the issue of whether Category II veterans were entitled

to naturalization was before our court in *Pangilinan v. INS,* No. 80–4543. A panel has since held that because the Attorney General acted beyond his authority in revoking the naturalization of the vice consul in the Philippines, Category II applicants were entitled to be naturalized under the federal court's equitable powers. *Id.,* 796 F.2d 1091 (9th Cir.1986), *reh'g denied,* 809 F.2d 1449 (9th Cir.1987). Certiorari to the Supreme Court was granted Oct. 5, 1987. *Contra Olegario v. United States,* 629 F.2d 204 (2d Cir.1980), *cert. denied,* 450 U.S. 980, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981).

This action arose out of the INS's refusal to accept the Form N–400 applications of the appellants on the grounds that (1) the INS was not required to accept applications of foreign address applicants residing outside the jurisdiction of the Los Angeles District Office of the INS and (2) the appellants had not submitted evidence of their Category I status as required of foreign address applicants by INS policy.

Prior to filing suit, the applicants through their counsel attempted to resolve the dispute through written communication with the INS. When this failed, they petitioned *ex parte* the Clerk of the Court for the United States District Court, Central District of California, requesting that they be allowed to file petitions for naturalization directly with the court. Chief Judge Real issued an order permitting the filings. The INS, however, refused to schedule the appellants for preliminary examinations at the INS in Los Angeles and refused to make recommendations to the court concerning the eligibility of the petitioners. The INS moved to vacate Judge Real's order, on the ground that the district court lacked jurisdiction to entertain petitions for naturalization filed by foreign address applicants. The district court denied the government's motion. The government then filed a Notice of Appeal and requested a stay pending the appeal. The district court denied the government's request for a stay. A different district court judge, Judge Tashima, denied cross motions for summary judgment in this proceeding.

The government six weeks later dropped its appeal of Judge Real's order. ·

After denying summary judgment, the district court on the INS's motion ordered these proceedings stayed pending the final decision in Pangilinan. The applicants appealed, maintaining that this court has jurisdiction under 28 U.S.C. § 1292(a)(1). A motions panel of this court properly held that we have jurisdiction under § 1292(a)(1) to hear the appeal.

## DISCUSSION

### Jurisdiction

■ Section 1292(a)(1) provides jurisdiction over "[i]nterlocutory orders of the district court of the United States ... granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court." The district court denied the applicants' motion for summary judgment and stayed the actions pending the final decision in Pangilinan.

Normally, an appellate court lacks jurisdiction over an order denying summary judgment, Switzerland Cheese Association v. E. Horne's Market, 385 U.S. 23, 25, 87 S.Ct. 193, 195, 17 L.Ed.2d 23 (1966), on the theory that the district court merely postponed its consideration of the merits of the claim, and could still grant injunctive relief. An order denying summary judgment may be reviewed under section 1292(a)(1), however, if the order has the practical effect of denying a permanent injunction. EEOC v. Pan American World Airways, Inc., 796 F.2d 314 (9th Cir.1986), cert. denied, —— U.S. ——, 107 S.Ct. 874, 93 L.Ed.2d 829 (1987). Pan American applies the three-part test set out in Carson v. American Brands, Inc., 450 U.S. 79, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981): (1) does the order have the practical effect of a grant or denial of an injunction? (2) does the order have serious, perhaps irreparable consequences? and (3) is the order one that can be challenged effectively only by immediate appeal? Pan American, 796 F.2d at 316.

■ The government asserts that a writ of mandamus is not equivalent to an injunction. This is incorrect. In Tagupa v. East–West Center, Inc., 642 F.2d 1127 (9th Cir.1981), we held that in construing appealability under section 1292(a)(1), we consider the "substantial effect" of the district court's order rather than its "terminology." Id. at 1129 (quoting United States v. Cities Service Co., 410 F.2d 662, 663 n. 1 (1st Cir.1969)). Therefore, a denial of a petition for a writ of mandamus may be appealed under the section where, had the petitioner succeeded, the district court properly could have issued a mandatory injunction to compel the federal agency defendants to carry out their duties. Cf. Fallini v. Hodel, 783 F.2d 1343 (9th Cir.1986) (where the effect of a mandatory injunction is the same as a writ of mandamus, it is governed by similar considerations).

We find persuasive the arguments in favor of exercising jurisdiction. The combination of the denial of summary judgment and an indefinite stay of proceedings may foreclose many of the veterans, who are now quite elderly, from ever realizing their right, if any, to naturalization. Further, the veterans assert a preliminary right to have their applications processed, a right not before the court in Pangilinan. Even if final approval of the Category II veterans' petitions must await the Supreme Court's decision in Pangilinan, the petitions at least would have been processed and ready for a district court's naturalization decision. Finally, some of the plaintiffs may be Category I veterans, whose claims are not affected by Pangilinan.

■ We must also determine whether the court has jurisdiction to consider whether the stay was proper. The stay is part and parcel of the district court's order denying injunctive relief. Although the district court treated the summary judgment motion and the stay issues separately, it declined to award appellants summary judgment "at this time" because "uncertainty as to the law of the Circuit" prevented the INS's acts from being unreasonable. Because the imposition of the stay, together with the denial of summary judgment,

prevents the district court from awarding injunctive relief, we conclude that we have jurisdiction to consider whether the district court properly imposed a stay. *See Construction Laborers Pension Trust v. Cen-Vi–Ro Concrete Pipe & Products Company,* 776 F.2d 1416, 1421–23 (9th Cir.1985) (applying *Carson* test to denial of stay). *See also Watson v. Commissioners Court of Harrison County,* 616 F.2d 105, 107 n. 5 (5th Cir.1980) (trial court's imposition of a stay in voting rights action pending census reviewable under 28 U.S.C. § 1292(a)(1)); *Goldberg v. Carey,* 601 F.2d 653, 657–58 & n. 1 (2d Cir.1979). In addition, the court may assert jurisdiction over the stay as incident to other jurisdiction. *See Mercury Motor Express, Inc. v. Brinke,* 475 F.2d 1086, 1090–91 (5th Cir.1973); *Semmes Motors, Inc. v. Ford Motor Company,* 429 F.2d 1197, 1201 (2d Cir.1970).[1]

### Stay of Proceedings

■ We review a trial court's stay of an action for abuse of discretion.[2] *Mediterranean Enterprises, Inc. v. Ssangyong Corp.,* 708 F.2d 1458, 1465 (9th Cir.1983). A trial court has the power to control its own calendar. *Id.* A trial court, for instance, may find that imposing a stay of proceedings, pending resolution of separate proceedings, would be most efficient for the court and fairest to the parties. The separate proceedings need not control directly the action before the court for a stay to be appropriate. *Id.* (quoting *Leyva v. Certified Grocers of California, Ltd.,* 593 F.2d 857, 863–64 (9th Cir.), *cert. denied,* 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979)).

■ Although *Pangilinan* may have some effect on this case, it will not be substantial. Unless our court's decision is reversed, Category II veterans must be naturalized and the INS's requirement that a Filipino veteran prove Category I status is arbitrary and capricious. If the Supreme Court ultimately reverses, the extent of any injury will consist of no more than duplicative litigation.

The INS asserts, however, that if *Pangilinan* is ultimately reversed, authorizing the district court at this time to proceed could result in the illegal naturalization of the Category II veterans. This argument, however, misunderstands the appellants' claims. The appellants maintain that they should not bear the burden of proving Category I status in advance as a condition of processing their applications, but rather that the INS has an obligation to take certain preliminary steps in respect to all foreigners who have submitted applications for naturalization. Thus, even if our decision in *Pangilinan* is reversed by the Supreme Court, and Category II veterans are held to be ineligible for naturalization, the appellants could still succeed on the issue of whether the INS can prevent an application from reaching the district court because the applicant has not been allowed to comply with INS requirements. Further, requiring the INS to proceed with preliminary processing would not result necessarily in the naturalization of foreigners who are ineligible. A federal district court retains the ultimate authority in naturalization petitions, and would be required to consider the *Pangilinan* issue at that time.[3] The effect of proceeding before the final decision in *Pangilinan* could represent unnecessary work for the INS in terms of preparing the applications of veterans later found ineligible for naturalization, but the INS overstates its case in asserting that applicants could be naturalized who would later be found to be ineligible.

One additional fact must be considered: Many of the petitioners are elderly. They have waited over one year for the Ninth

---

1. Because we find jurisdiction under the *Carson* test, and incident to other jurisdiction, we do not need to apply the *Enelow–Ettelson* rule. *See, e.g., Construction Laborers,* 776 F.2d at 1419–21.

2. Apparently, the stay is still in effect. We interpret the language, "the final decision in *Pan-*

*gilinan"* as referring to the Supreme Court's final word rather than that of our court.

3. We take no position on whether a stay might be appropriate *after* the INS has processed appellants' petitions and made recommendations to the district court.

Circuit decision and may have to wait another year for a decision from the Supreme Court. Because the harm in proceeding is relatively minor, but the harm in not proceeding may be to deny some of the plaintiffs relief, we find that the district court abused its discretion in staying the action pending the final decision in *Pangilinan.*

The district court abused its discretion for another reason. Some of the appellants may, in fact, be Category I veterans. Because they have not supplied evidence of their category, we cannot know, on the current state of the record, what the status of all of the appellants is. *Pangilinan* would have no effect on Category I applicants.

### Writ of Mandamus

■ The district court denied the appellants' motion for summary judgment by reasoning that because the law was confused on the *Pangilinan* question, the INS was not under a clear duty to act in a particular way. We review the district court's order denying mandamus for abuse of discretion. *Fallini v. Hodel,* 783 F.2d 1343, 1345 (9th Cir.1986).

Mandamus may be granted when (1) the plaintiff's claim is clear and certain; (2) the duty is "ministerial and so plainly prescribed as to be free from doubt"; and (3) no other adequate remedy is available. *Id.* The government challenges the appellants' assertion that they have a plain and clear right to have the act in question performed.

■ The INA imposes a mandatory duty on the INS to conduct preliminary proceedings.[4] Section 1446 provides:

(a) At any time prior to the holding of the final hearing on a petition for naturalization ... an employee of the Service, or of the United States designated by the Attorney General, shall conduct a personal interview of the person petitioning for

naturalization.... The Attorney General may, in his discretion, waive a personal investigation....

(b) The Attorney General shall designate employees of the Service to conduct preliminary examinations upon petitions for naturalization to any naturalization court and to make recommendations thereon to such court....

. . . . .

(d) The recommendation of the employee designated to conduct any such preliminary examination shall be submitted to the court at the hearing upon the petition and shall include a recommendation that the petition be granted, or denied, or continued, with reasons therefor.

8 U.S.C. § 1446.

We interpret this provision in light of the scheme established by Congress by which naturalization decisions are reached. It is beyond dispute that Congress has given naturalization authority to the courts. 8 U.S.C. § 1421(a); 8 U.S.C. § 1446(d); *see also* 3 C. Gordon & H. Rosenfeld, *Immigration Law and Procedure* § 16.7a, at 16–37 (1987). The role of the INS is to assist the courts in their decision-making capacity. 3 C. Gordon & H. Rosenfeld, § 14.4b at 14–47. Although foreigners do not have an absolute right to be naturalized, all foreigners who wish to apply for naturalization have a right to file a petition with a naturalization court and to obtain a final ruling from the court. *See* 8 U.S.C. § 1421; *United States v. Schwimmer,* 279 U.S. 644, 49 S.Ct. 448, 73 L.Ed. 889 (1929); *see also* C. Gordon & H. Rosenfeld, § 16.7a, at 16–37. No one, including the INS, can interfere with this right.

Typically, upon an application for naturalization, the INS performs certain procedures, including a personal interview and a preliminary examination. These procedures collect information about the applicant that is used by the INS to make a

---

4. Because we find a mandatory duty under 8 U.S.C. § 1446, we do not need to consider the appellants' argument that the regulation was not promulgated in conformity with the requirements of the Administrative Procedure Act, 5 U.S.C. §§ 551(4), 552, 553(b) and (c). The appellants also assert claims arising under the due process clause and equal protection clause of the fifth amendment. Because these claims look to whether the appellants were conferred a right and whether the INS is acting reasonably, inquiries that turn on the construction of 8 U.S.C. § 1446, the claims are superfluous.

recommendation to the naturalization court about whether to grant the petition. By refusing to process the applications of the Filipino veterans, the INS effectively is preventing the applications from receiving the attention of the court.

By using the term "shall," Congress has required expressly that immigration officials conduct personal interviews with applicants, unless waived by the Attorney General in his discretion. Congress also has required expressly that the immigration official who conducts a preliminary examination submit a recommendation to the court. Under this statutory scheme it would not be a proper exercise of discretion to refuse to perform an interview on the ground that the application may ultimately be refused by the naturalization court. A good faith recommendation, we suggest, must be based on the information derived from the processing procedure. Implicitly, then, section 1446(d), requires that the INS process applications and conduct investigations. Finally, section 1446(b) requires the Attorney General to "designate employees of the Service to conduct preliminary examinations...." The common sense interpretation of this provision is that Congress intended that employees be designated to conduct the examinations and that they conduct the examinations they were appointed to conduct. The court then performs its role in granting or denying the applications giving due consideration to the INS's recommendations. We therefore hold that Section 1446 requires the INS to perform investigatory procedures on applications so that it may make a recommendation to the court. *See Knauff v. Shaughnessy,* 179 F.2d 628, 629 (2d Cir.1950) (8 U.S.C. § 733, [predecessor to 8 U.S.C. § 1446] requires the Naturalization Service to act on preliminary petition).

The INS does not dispute this interpretation of 8 U.S.C. § 1446, but rather asserts that in this case its refusal to process the applications is reasonable. The government characterizes its action as merely imposing a burden on the appellants to produce evidence that may be required if *Pangilinan* is reversed. Certainly if we apply our decision in *Pangilinan,* the INS's re-

quirement is arbitrary and capricious. Examining the district court's decision using the law as it existed before *Pangilinan,* we first note that several appellants had in fact submitted evidence of their Category I status. As to these appellants, the district court erred in not granting summary judgment. Second, even if Category II applicants ultimately are found ineligible for naturalization, the statute does not authorize the burden the INS would impose, but instead requires the INS to go forward with its investigation and examination. While the INS may have the right to impose reasonable preconditions upon an investigation which do not appear in the statute, in this case the precondition was unreasonable. An INS–conducted investigation and examination is the best way, perhaps the only way, to discover whether appellants fit in Categories I or II. Appellants are unlikely to have copies of military or immigration records relating to a period 40 years ago. The INS has far superior access to such records than private individuals in the Philippines. Moreover, the Second War Powers Act of 1942, and its legislative history, as reviewed in *Pangilinan,* make it clear the Congress intended to make it easier for Filipino war veterans to apply for naturalization than it would be for other applicants. Given these unique factors, the INS acted unreasonably in demanding that appellants prove their Category I status before the INS would act on their petitions. Furthermore, the government's argument that under the statute, even American nationals must bear a burden of producing evidence of eligibility, 8 U.S.C. § 1503(b), cuts against its position, because under that section the burden is imposed by Congress.

■ The INS, in urging that the appellants do not have a clear right to be naturalized, is in effect saying no court has jurisdiction to naturalize applicants that do not reside in the United States. The government's argument rests on essentially two grounds: one procedural and one substantive. First, the INS asserts that because the law on this issue is unsettled, the applicants do not have a clear right to

processing by the INS. We disagree. The inquiry of whether an individual has a "clear right" is often essentially the same inquiry as whether the government has a "duty": that is, whether the duty is ministerial or discretionary. *See* 1 *Moore's Federal Practice* ¶ 0.62(17) at 700.52. The inquiry as to whether an individual has a "clear right" may also involve whether a factual determination is required to ascertain the scope of the duty with regard to a given individual. *See, e.g., Moose v. United States,* 674 F.2d 1277, 1284 (9th Cir. 1982). The inquiry, however, does not hinge on whether a statute must be interpreted to determine whether the official has a ministerial duty. Mandamus relief does not become unavailable simply because a statute requires construction. *Fallini,* 783 F.2d at 1345; *Knuckles v. Weinberger,* 511 F.2d 1221, 1222 (9th Cir.1975).

On the merits, the INS asserts that the INA may not provide jurisdiction to the district court to naturalize these applicants, so that the INS's duty to investigate does not arise. The INA provides that the "jurisdiction of naturalization courts" is limited to "only ... such persons resident within the respective jurisdiction of such courts, except as otherwise provided in this title." 8 U.S.C. § 1421(a). We do not decide whether jurisdiction is "otherwise provided" because we conclude that the government, because it abandoned its appeal of Judge Real's order, is barred by collateral estoppel from raising the issue in this proceeding.

 We have interpreted section 1421(a) as a statute conferring venue, rather than a statute conferring subject matter jurisdiction. *In re Duncan,* 713 F.2d 538, 542 (9th Cir.1983). The doctrine of res judicata applies to preclude issues of venue as well as substantive issues. *Ripperger v. A.C. Allyn & Co.,* 113 F.2d 332 (2d Cir.), *cert. denied,* 311 U.S. 695, 61 S.Ct. 136, 85 L.Ed. 450 (1940); 1B *Moore's Federal Practice* ¶ 0.405[5] at 224, n. 6; *cf. Americana Fabrics, Inc. v. L & L Textiles, Inc.,*

754 F.2d 1524, 1529 (9th Cir.1985) (doctrine applies to previous determination of jurisdiction). The federal government is bound by collateral estoppel if an issue of law is decided against the government in the same or related cases involving the same parties and similar facts. *United States v. Stauffer Chemical Co.,* 464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984); *United States v. Mendoza,* 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984).

 In its motion to vacate Judge Real's order, the government relied on the argument that the district court did not have jurisdiction to consider petitions filed by non-residents. The court denied the motion. The district court was fully advised of the issue and ruled against the government.[5] Importantly, the government filed a notice of appeal, but chose to withdraw it, only after the district court in this proceeding stayed the action and declined to rule on the summary judgment motions. The doctrine of collateral estoppel is designed to prevent just this sort of attempt to relitigate an issue.

Finally, the INS argues appellants have no "clear right" because the INS has no authority to issue visas. But the applicants have not requested that the INS issue visas nor even that it recommend to the State Department that it issue visas. Rather, they request that the INS schedule preliminary proceedings in the United States, and rely on the policy of the American consul to issue visas to applicants presenting interview notices from the INS in the United States directing them to appear in connection with their applications for naturalization. The INS's lack of authority to issue visas should not prevent the applicants from enjoying the rights otherwise afforded them by 8 U.S.C. § 1446. We conclude that the applicants have a clear right to have their petitions processed by the INS upon the acceptance of the petitions by the district court.

---

**5.** Although a motion to vacate is committed to the discretion of the district court, *see Plotkin v. Pacific Telephone & Telegraph Company,* 688 F.2d 1291, 1292 (9th Cir.1982) (Rule 60(b) motions reviewed for abuse of discretion), the court must apply the correct legal standard in ruling on the motion. *See Fallini v. Hodel,* 783 F.2d 1343, 1345 (9th Cir.1986).

The INS understandably has not challenged the right to mandamus relief based on the remaining prong: whether alternative relief is available. We conclude that no alternative relief is available. The alternative would be to direct the naturalization court to proceed without the benefit of an INS recommendation. However, since 1926, Congress has determined that the immigration system works most fairly and efficiently when a naturalization examiner performs the investigatory steps necessary to prepare the application for consideration, and the court then renders the naturalization decision. 3 C. Gordon & H. Rosenfeld, § 14.2 at 14–10 to 14–11. This balance would be disturbed by our requiring the naturalization court, a federal district court with other heavy responsibilities, to shoulder the entire burden. Accordingly, we direct the district court to grant mandamus relief to the applicants, by ordering the INS to process, interview, and classify into Categories I, II, and III all applicants whose petitions are accepted by the district court.

REVERSED and REMANDED.

POOLE, Circuit Judge, dissenting.

I believe it to be altogether unseemly for this court to rush into an opinion with full knowledge that the progenitor case upon which we rely for our authority, *Pangilinan v. INS*, 796 F.2d 1091 (9th Cir.1986), *reh'g denied*, 809 F.2d 1449 (9th Cir.1987), is about to be decided by the United States Supreme Court. Certiorari was granted in our *Pangilinan* case on October 5, 1987, and a decision therein is unquestionably near. *See* —— U.S. ——, 108 S.Ct. 66, 98 L.Ed.2d 30 (1987). I would defer deciding *Agcaoili* out of prudence and deference; the majority is venturesome indeed in refusing to do so. In granting certiorari, the Supreme Court ordered it consolidated with the appeal from another decision of this circuit, *Manzano v. INS*, No. 84–6031 (9th Cir. Sept. 26, 1986) (unpublished), which was based on *Pangilinan*.

The above consolidated appeals were argued in the Supreme Court on February 24, 1988. 28 S.Ct.Bull. 8103 (3/21/88). It is a reasonable expectation that both cases will be decided in the near future; surely in this term. The legal foundation upon which *Pangilinan* and *Manzano* rest are of uncertain duration. While the mere grant of certiorari is no certain predictor of the final outcome, the fact that the Supreme Court took for review both the published and the unpublished opinions is some hint that the Court intends more than the bestowal of its blessing upon our treatment of an issue as fundamental as is presented in these appeals. With light so near at hand, I would await its guiding beam. After all the procedures which this circuit has reviewed have lain moribund for more than 40 years. If indeed we have been blessed with the resuscitative gift inherent in our creative decrees, the beneficiaries of our jurisprudence would gain, not lose, by confirmation from the highest source that ours was indeed the way, the truth, and the life.

Since the majority is disinclined to await the certainty of ultimate affirmance, I respectfully dissent.